CENTRAL NEW YORK BASKETBALL, INC., PLAINTIFF, *v.* BARNETT AND CLEVELAND BASKETBALL CLUB, INC., DEFENDANTS.

Common Pleas Court, Cuyahoga County.

No. 757982. Decided December 21, 1961.

*Messrs. Marshman, Hornbeck, Hollington, Steadman & McLaughlin, Mr. Edward Crouch,* of counsel, and *Mr. George Gallantz,* New York, New York, for plaintiff.

*Messrs. Walter & Haverfield, Mr. F. Wilson Chockley, Jr.,* of counsel, *Messrs. McCreary, Hinslea & Ray, Mr. Lee Hinslea,* of counsel, and *Mr. Creighton Miller,* for defendants.

DANACEAU, J.  This is an action for injunctive relief brought by the plaintiff, Central New York Basketball, Inc., a New York corporation, against Richard Barnett and Cleveland Basketball Club, Inc., a corporation.  Plaintiff owns and operates a professional basketball team under the name of Syracuse Nationals, having a franchise of the National Backetball Association, now in its 16th season.

The defendant, Richard Barnett, a professional basketball player, the No. 1 draft choice in 1959 of the plaintiff and who played for the plaintiff during the ensuing 1959 basketball season, played for the Syracuse club throughout the 1960 basketball season under a signed and executed Uniform Player Contract of the National Basketball Association under date of March 16, 1960 by and between the plaintiff and said defendant, a copy of said agreement is attached to the petition, and was received in evidence as plaintiff's Exhibit B.

The defendant, Cleveland Basketball Club, Inc., is a member of the American Basketball League, recently organized, and owns and operates a professional basketball team.

In July of 1961, the defendants, Barnett and Cleveland Basketball Club, Inc., made and entered into an American Basketball League Player Contract in which the club engaged the player to render his services as a basketball player for a term beginning on September 15, 1961 and ending on September 14,

42

1962, a copy of said contract having been received in evidence as plaintiff's Exhibit A.

The National Basketball Association has professional basketball clubs in the cities of New York, Philadelphia, Syracuse, Boston, Detroit, Cincinnati, Chicago, St. Louis and Los Angeles. The American Basketball League has professional clubs in the cities of Washington, Pittsburgh, Cleveland, Chicago, Kansas City, San Francisco and Los Angeles and the State of Hawaii.

Plaintiff claims that the defendant, Barnett, is a professional player of great skill and whose talents and abilities as a basketball player are of special, unique, unusual and extraordinary character; that the defendant, Cleveland Basketball Club, Inc., knew that he was under contract with the plaintiff; that in accordance with the terms and conditions of said contract the plaintiff exercised a right to renew said contract for an additional year as provided therein and so notified the defendant Barnett, that the defendant Barnett breached the said contract by failing and refusing to play with and for the said plaintiff during the 1961-1962 playing season, and that said breach of contract was committed with the knowledge and participation of the defendant, Cleveland Basketball Club, Inc.

Plaintiff claims that it cannot reasonably or adequately be compensated for damages in an action at law for the loss of defendant Barnett's services as required by said contract and an oral agreement between plaintiff and Barnett made in May of 1961, and that plaintiff will suffer immediate and irreparable damages. Plaintiff, therefore, prays:

1. that defendant Richard Barnett be restrained and enjoined, during the pendency of this action and permanently, from playing basketball or engaging in any activities relating to basketball for The Cleveland Basketball Club, Inc., or any person, firm, club or corporation other than the plaintiff, during the 1961-1962 basketball season.

2. that defendant Cleveland Basketball Club, Inc., be restrained and enjoined, during the pendency of this action and permanently, from any interference or attempted interference with the performance by the said Richard Barnett of his contract with plaintiff.

The defendant, Cleveland Basketball Club, Inc., admits that the defendant Barnett is a professional basketball player but denies that he is of great skill and denies that his talents and abilities as a basketball player are of special, unique, unusual and extraordinary character; and further admits that the defendant Barnett has played professional basketball in the National Basketball Association as an employee of the plaintiff. The defendant club denies that it had knowledge that the defendant Barnett was under contract with the plaintiff as alleged and denies that it solicited defendant Barnett to enter into a contract to play basketball for the defendant club, or that it persuaded defendant Barnett to enter into a contract with it with the intention of inducing defendant Barnett to breach his alleged contract with the plaintiff, and denies that the alleged contract was in effect for the 1961-1962 playing season, but admits that it entered into a written contract with defendant Barnett for the 1961-1962 playing season. Except for the admissions specifically made, the defendants deny specifically all other allegations contained in the petition.

The defendants, Barnett and Cleveland Basketball Club, Inc., further allege that plaintiff is a "foreign corporation and that it has no standing in the courts of Ohio without complying with the Foreign Corporation Act, which it has not done."

The separate answer of the defendant, Richard Barnett, conforms to the answer of the Cleveland Basketball Club, Inc. and further admits that on or about March 16, 1960, he and the plaintiff signed a written document and that a copy of the said document, annexed to the petition as Exhibit B, is a true copy thereof, but denies that said instrument is a contract. Said defendant further admits that he played professional basketball for plaintiff during the 1960-1961 season and that plaintiff paid him the sum of $8,500, but denies that as partial consideration therefor he promised to give the plaintiff the right to renew said contract as provided in paragraph 22(a) thereof and promised not to play otherwise than with plaintiff. The said defendant further denies that plaintiff exercised its option to renew the alleged contract with him for the next playing season and denies that plaintiff, through its General Manager, negotiated with him as to the amount to be paid for the 1961-1962

44

basketball season and denies that the parties agreed that he would be paid $11,500 for the next season. The defendant Barnett admits that on or about May 26, 1961, plaintiff dispatched to him by registered mail copies of an alleged contract in substantially the same form as Exhibit B annexed to the petition, that it was dated May 26, 1961 and that said copies had not been returned to plaintiff by him. The said defendant specifically denies that said alleged contract was agreed to by the parties. The defendant further admits that he has publicly stated that he does not intend to play basketball for the plaintiff during the 1961-1962 basketball season and admits that at the time of the filing of the petition he was taking part in training and practice sessions with the Cleveland Basketball Club, Inc., basketball team and was engaged in activities relating to basketball with the defendant corporation.

Both defendants deny plaintiff's allegation that plaintiff has been and is now ready, willing and able to fulfill all the terms and conditions of its alleged contract with the defendant Barnett and has offered so to do.

The written agreement under date of March 16, 1960 and signed by the plaintiff and the defendant Barnett provides in part as follows:

"5. The Player promises and agrees (a) to report at the time and place fixed by the Club in good physical condition; and (b) to keep himself throughout the entire season in good physical condition; and (c) to give his best services, as well as his loyalty, to the Club, and to play basketball only for the Club unless released, sold or exchanged by the Club; and (d) to be neatly and fully attired in public and always to conduct himself on and off the court according to the highest standards of honesty, morality, fair play and sportsmanship, and (e) not to do anything which is detrimental to the best interests of the Club or of the National Basketball Association or of professional sports.

"9. The Player represents and agrees that he has exceptional and unique skill and ability as a basketball player; that his services to be rendered hereunder are of a special, unusual and extraordinary character which gives them peculiar value which cannot be reasonably or adequately compensated for in

damages at law, and that the Player's breach of this contract will cause the Club great and irreparable injury and damage. The Player agrees that, in addition to other remedies, the Club shall be entitled to injunctive and other equitable relief to prevent a breach of this contract by the Player, including, among others, the right to enjoin the Player from playing basketball for any other person or organization during the term of this contract.

"22. (a) On or before September 1st (or if a Sunday, then the next preceding business day) next following the last playing season covered by this contract, the Club may tender to the Player a contract for the term of that season by mailing the same to the Player at his address following his signature hereto, or if none be given, then at his last address of record with the Club. If prior to the November 1 next succeeding said September 1, the player and the Club have not agreed upon the terms of such contract, then on or before 10 days after said November 1, the Club shall have the right by written notice to the Player at said address to renew this contract for the period of one year on the same terms, except that the amount payable to the Player shall be such as the Club shall fix in said notice; provided, however, that said amount shall be an amount payable at a rate not less than 75% of the rate stipulated for the preceding year.

"(b) The Club's right to renew this contract, as provided in subparagraph (a) of this paragraph 22, and the promise of the Player not to play otherwise than with the Club have been taken into consideration in determining the amount payable under paragraph 2 hereof."

Plaintiff contends that the foregoing provisions provide for two alternatives: 1) that the parties may agree upon a signed new contract for the next succeeding playing season and 2) in the event a signed agreement is not made, the club has the right to renew the contract for a period of one year on the same terms, except that the salary shall be fixed by the club and shall be payable at a rate not less than the stipulated minimum.

The plaintiff contends that under the second alternative, the terms are the same as in the preceding year except for the

amount of salary and that at the close of the renewal year, the contract has been completed and is at an end.

The defendants, on the other hand, interpret the contract to provide for perpetual service and, consequently, is void.

It is said in 11 Ohio Jurisprudence (2d), 398:

"Generally, a liberal construction should be put upon written instruments so as to uphold them, if possible, and carry into effect the intention of the parties. Courts are required, by applying known rules of law, to enforce valid and reasonable contracts of parties, with the view of carrying out their clear intent, rather than, by resorting to technical construction, to render such contracts void. A contract should be given that construction that will uphold it and preserve to the parties thereto their rights, if the same can be done without doing violence to the language of the contract. Wherever the language of a contract will permit, it should be so construed as to support rather than to destroy legal obligation. . . .

". . . If the language of a contract is susceptible of two constructions, one of which will render it valid and give effect to the obligation of the parties, and the other will render it invalid and ineffectual, the former construction must be adopted."

Then continuing on page 399, it is said:

"In construing a written instrument, effect should be given to all of the words if this can be done by any reasonable interpretation; and it is the duty of a court to give effect to all parts of a written contract, if this can be done consistently with the expressed intent of the parties. If possible, every provision in a contract should be held to have been inserted for some purpose and to perform some office, and an attempt must be made to harmonize, if possible, all the provisions of a contract."

The construction of the contract urged by plaintiff, to which it is committed in open court, is reasonable, rational, practical, just and in accordance with the foregoing principles, and is adopted by this Court.

The defendant Barnett had previously played for the Syracuse team during the greater part of the 1959-1960 season under a signed contract.

Daniel Biasone, the President and General Manager of the Syracuse club, testified that near the close of the 1960-1961 season in March of 1961, he told the defendant Barnett that Barnett was one of seven players he would keep exempt from the forthcoming draft of players from all National Basketball Association clubs to stock the new Chicago club and that Barnett was one of the seven players he was "protecting."

In the latter part of May, 1961, Mr. Biasone reached the defendant Barnett by telephone, and they discussed salary for the next season and agreed upon an increase of $3,000 which would bring the salary of Barnett to $11,500. He further testified that Barnett said, "You mail them (contracts) down and I will sign them and return them." (R. 52.) On cross-examination Biasone said that he was not sure and did not know whether Barnett said "I will sign." (R. 108.)

The defendant Barnett testified (R. 176):

"Q. What did he say?

"A. Well, he called me up and said that he wanted to discuss contracts for the coming year.

"Q. What did you say?

"A. I said that I thought I was worth $3000 more.

"Q. And he said?

"A. He agreed. He said, 'I think you are worth $3000 more myself.' I said, 'Send the contracts and I will look them over.' "

New contracts with the signature of plaintiff thereon were mailed to the defendant Barnett on May 26, 1961; and they remained with Barnett unsigned ever since.

In June of 1961, there was a telephone conversation between Jerry Walser, the Business Manager of the Syracuse club, and the defendant Barnett in which Barnett asked for an advance. Barnett testified (R. 184-185):

"Q. What else was said in this conversation?

"A. Well, I asked for an advance on my—I asked for an advance of $300.

"Q. $300?

"A. That's right.

"Q. Did he say he would send you $300?

"A. He said as soon as Mr. Biasone returned—that he

was away and that as soon as he could get his signature that they would advance the $300."

On July 10, 1961, the plaintiff, through Jerry Walser, mailed to Barnett a letter enclosing a check for $3,000. Mr. Biasone testified (R. 55):

"Q. . . . Was money sent to Barnett for the 61-62 season, the current season?

"A. Yes.

"Q. When was that sent?

"A. The early part of July.

"Q. Of this year?

"A. This year.

"Q. And why was it sent?

"A. It was asked for.

"Q. By whom?

"A. By Dick.

"Q. How much money was sent to Mr. Barnett?

"A. $3000."

The letter and check were received by Barnett and remained in the sealed envelope until produced in court during a hearing on an application for a preliminary injunction on October 9, 1961.

Finding that the contracts mailed to Barnett were not returned and not hearing from Barnett, Mr. Biasone made repeated attempts to contact or reach the defendant Barnett in July and August of 1961 by telephone, telegram and letter, to all of which there was no response. On November 6, 1961, a letter from the plaintiff to the defendant was written and mailed and received by Barnett which reads as follows:

"It is our position that your 1960-61 contract with us was renewed when we came to terms and we sent you an advance. However, to abide by the letter of the contract and to make the position of the Syracuse Nationals absolutely clear, we hereby notify you that pursuant to Paragraph 22 (a) of said contract, we hereby renew the same for the period of one year ending October 1, 1962. The amount payable to you under such renewed contract is hereby fixed at $11,500."

Meanwhile, during the months of June and July of 1961, Barnett met and talked to his former coach and advisor, John B. McLendon, who was the Coach of the Cleveland Pipers

Basketball team of the defendant Cleveland Basketball Club, Inc. Both Barnett and McLendon stated that Barnett did not want to play for Syracuse but did want to play for the Cleveland Pipers. However, they were both concerned about the "Kenny Sears" case, then pending in the California court. It appears that Sears was trying to "jump leagues" (R. 211) to play for San Francisco and both wanted to see the outcome of the case. Undoubtedly, this explains the lack of communication from Barnett to the Syracuse club during June and July of 1961, his failure to return the contracts and his failure to open the envelope containing the letter and check enclosed therein.

Relying upon a newspaper story and their interpretation thereof to the effect that Sears "would not be penalized for going to this new League," Barnett and McLendon proceeded to take the necessary steps culminating in a signed contract between Barnett and the Cleveland Pipers with McLendon signing the contract on behalf of the Cleveland Club.

The request of Barnett for an advance, whether it was $300 or $3,000, renders strong support to the claim of plaintiff that an oral agreement on a salary had been reached and that Barnett would play for Syracuse during the 1961-1962 season. Manifestly, unless there was such an understanding, there could be no salary upon which such an advance could be made. The evidence is overwhelming, and this Court finds that the plaintiff and the defendant Barnett reached an understanding that Barnett would play for Syracuse during the 1961-1962 season at a salary of $11,500. It is also quite clear that Barnett and McLendon of the Cleveland Pipers were acting in concert in awaiting the ruling in the Sears case; and after reading the newspaper report, decided that Barnett could "jump" without penalty and sign up with the Cleveland Pipers. Barnett and McLendon decided that they had the green light and the "jump" was made.

The defendants challenge the validity and enforceability of the renewal provisions of the contract on the ground that they lack mutuality. The renewal clauses are an integral part of the contract, and there is sufficient consideration for the obligations and duties arising thereunder.

In *Fuchs* v. *Motor Stage Co.*, 135 Ohio St., 509, 515, it was said:

". . . The authorities are to the effect that so long as there is consideration for the obligation of the defendant, it is not essential that there be mutuality of obligation between plaintiff and defendant in order to sustain a right of action in the plaintiff against the defendant for a breach of such obligation; . . ." and at page 520:

"Since the plaintiff has given full and adequate consideration to the defendant in the purchase of the stock in the defendant company, there is a binding obligation upon the part of the defendant to carry out its covenant in the contract to purchase its requirements from the plaintiff so long as the plaintiff retains the stock and furnishes the merchandise requirements to the defendant as stipulated in the contract. While there is no mutuality of obligation, there is sufficient consideration to require performance upon the part of the defendant so long as the plaintiff demands it within the term of the contract and so long as he himself complies with the conditions which keep the contract in force."

In the case of *Philadelphia Ball Club* v. *Lajoie*, 202 Pa., 210, 58 L. R. A., 227, 229, the opinion of the court reads:

"We are not persuaded that the terms of this contract manifest any lack of mutuality in remedy. Each party has the possibility of enforcing all the rights stipulated for in the agreement. It is true that the terms make it possible for the plaintiff to put an end to the contract in a space of time much less than the period during which the defendant has agreed to supply his personal services; but mere difference in the rights stipulated for does not destroy mutuality of remedy. Freedom of contract covers a wide range of obligation and duty as between the parties, and it may not be impaired, so long as the bounds of reasonableness and fairness are not transgressed." and at page 230:

"The case now before us comes easily within the rule as above stated. The defendant sold to the plaintiff, for a valuable consideration, the exclusive right to his professional services for a stipulated period, unless sooner surrendered by the plaintiff, which could only be after due and reasonable notice

and payment of salary and expenses until the expiration. Why should not a court of equity protect such an agreement until it is terminated? The court cannot compel the defendant to play for the plaintiff, but it can restrain him from playing for another club in violation of his agreement. No reason is given why this should not be done, except that presented by the argument, that the right given to the plaintiff to terminate the contract upon ten days' notice destroys the mutuality of the remedy. But to this it may be answered that, as already stated, the defendant has the possibility of enforcing all the rights for which he stipulated in the agreement, which is all that he can reasonably ask. Furthermore, owing to the peculiar nature and circumstances of the business, the reservation upon the part of the plaintiff to terminate upon short notice does not make the whole contract inequitable.''

This court holds that the renewal provisions of the contract involved herein are valid and enforceable.

Plaintiff claims that defendant Barnett is a professional basketball player of great skill and whose talents and abilities as a basketball player are of special, unique, unusual and extraordinary character.

There is some disagreement in the testimony as to the ability and standing of Barnett as a basketball player. Daniel Biasone, the General Manager of the Syracuse club for the past 16 years, testified that (R. 47): ''As of now I think Richard Barnett is one of the greatest basketball players playing the game.'' ''he is an exceptionally good shooter.'' (R. 48.) ''He is above average . . . with other foul shooters in the National Basketball Association and that he ranked 19th in the whole league (approximately 100 players) scoring, playing as a guard.'' (R. 48 and 49.) He further testified (R. 153):

''Q. What is your opinion as to his ability, that is, as a guard, now, at driving?

''A. Terrific.

''Q. What is your opinion as to his ability as play making as a guard?

''A. Good. He has all the abilities a good basketball player should have. He has all the talent of a great basketball player. He is terrific all the way around.''

Mr. Biasone also testified on cross-examination that he would place Barnett in the group of some specifically-named nine or ten unusual and extraordinary players in the National Basketball Association. (R. 109 and 110.)

Mr. Biasone also testified that Barnett was a box office attraction and was asked on cross examination: "on what basis do you say he was a great box office attraction?" He answered: (R. 128.)

"A. Because he, in my opinion, he is such a tremendous ball handler and he does things that have crowd appeal, he is noticeable. He appeals to the crowd because he does things extraordinary."

Coach McLendon of the Cleveland Pipers is not so generous in his appraisal. Barnett, in his opinion, is not in the class of the specifically named outstanding basketball players. McLendon concedes that both Barnett and Neuman, now playing for Syracuse in his first year as a professional, are both "pretty good." (R. 256.)

The defendant Barnett was asked by his counsel (R. 195):

"Q. Do you represent to this Court that you have exceptional and unique skill and ability as a basketball player?

"A. No.

"Q. Do you represent to this Court that your services are of a special, unusual and extraordinary character?

"A. No.

"Q. You do represent to the Court that you are a professional basketball player; is that correct?

"A. Yes.

"Q. Do you think you are as good as Oscar Robertson?

"A. No."

The defendants also presented one James Palmer, a professional basketball player, who testified that he did not think Barnett was playing the right position as a guard; that he is very weak on defense as far as driving goes; that he "goes straight for the boards" (R. 227) "Rather than pass it to somebody or set up a play." (R. 228.) Palmer concedes that Barnett "is a very good shooter" (R. 228); Mr. Palmer does not put Barnett in the class with the specifically-named basketball players who he said, "are just about in a class by themselves."

That the defendant Barnett was 19th among the top 25 scorers in the National Basketball Association in the 1960-61 season is confirmed in the statistics published on page 113 of the official Guide (plaintiff's Exhibit 4). On page 190 of the Guide is the record of Richard Barnett which indicates that he played in 78 games (out of 79) in the 60-61 season for a total of 1,970 minutes; that his F. G. M. percentage was .452; that his F. T. M. percentage was .712 and that he scored 1,320 points for an average of 16.9. The Guide also indicates that Barnett was not among the players in the East-West All Star Game on January 17, 1961 (Guide 144), nor was he among the players named in the U. S. Basketball Writers' All-NBA Team for 1961 (Guide 184).

The defendant Barnett may not be in the same class with the top ten basketball players. The Syracuse manager is not a disinterested witness, and he may have given an immoderate appraisal of the playing abilities of Barnett. On the other hand, neither are McLendon nor Barnett disinterested witnesses. McLendon's eagerness to secure the services of Barnett at a high salary ($13,000) indicates a higher opinion of Barnett's playing abilities than he was willing to concede at the trial of this case. Barnett was understandably under embarrassment when asked to give his opinion of his own abilities and to make comparisons with another named player.

The increase of salary from $8,500 to $11,500 agreed to by plaintiff, the Cleveland Basketball Club's willingness to pay $13,000, and the latter's eagerness to secure his services, all point to a high regard for his playing abilities. Whether Barnett ranks with the top basketball players or not, the evidence shows that he is an outstanding professional basketball player of unusual attainments and exceptional skill and ability, and that he is of peculiar and particular value to plaintiff.

His signed contract with Syracuse provides:

"9. The Player represents and agrees that he has exceptional and unique skill and ability as a basketball player; that his services to be rendered hereunder are of a special, unusual and extraordinary character which gives them peculiar value which cannot be reasonably or adequately compensated for in damages at law, and that the Player's breach of this contract will cause the Club great and irreparable injury and damage.

The player agrees that, in addition to other remedies, the Club shall be entitled to injunctive and other equitable relief to prevent a breach of this contract by the Player, including, among others, the right to enjoin the Player from playing basketball for any other person or organization during the term of this contract.''

The Cleveland contract contains a similar provision, which reads:—

''12. The Player represents and agrees that he has exceptional and unique skill and ability as a basketball player; that his services to be rendered hereunder are of a special, unusual and extraordinary character, which gives them peculiar value which cannot be reasonably or adequately compensated for in damages at law, and that the Player's breach of this Contract will cause the Club great and irreparable injury and damage. The Player agrees that, in addition to other remedies, the Club shall be entitled to injunctive and other equitable relief to prevent a breach of this Contract by the Player, including, among others, the right to enjoin the Player from playing basketball for any other person or organization during the term of this Contract, or any renewal thereof.''

The aforesaid provisions are contained in uniform players' contracts and it would seem that mere engagement as a basketball player in the N. B. A., or A. B. L., carries with it recognition of his excellence and extraordinary abilities.

An important growth in the field of equity has been the use of injunctions against the breach of negative agreements, both express and implied. Pomeroy's Specific Performance of Contracts, Third Ed. at page 75 reads:

''Another class of contracts stipulating for personal acts are now enforced in England by means of an injunction. Where one person agrees to render personal services to another, which require and presuppose a special knowledge, skill, and ability in the employe, so that, in case of a default, the same services could not easily be obtained from others, although the affirmative specific performance of the contract is beyond the power of the court, its performance will be negatively enforced by enjoining its breach. This doctrine applies especially to contracts made by actors, public singers, artists and others possessing a special skill and ability. It is plain that the prin-

ciple on which it rests is the same with that which applies to agreements for the purchase of land or of chattels having a unique character and value. The damages for the breach of such contracts cannot be estimated with any certainty, and the employer cannot, by means of any damages, purchase the same services in the labor market."

Pomeroy continues:—

"The more recent American cases are in accord with the English rule stated in the text, and where one person agrees to render personal service to another which require and presuppose a special knowledge, skill and ability in the employee, so that in case of default, the same services could not be easily obtained from others, equity will negatively enforce the contract by enjoining its breach."

The opinion of the Court in *Philadelphia Ball Club* v. *Lajoie, supra*, is summarized in 58 L. R. A., 227 in the headnotes as follows:—

"1. Impossibility of obtaining equivalent service is not necessary to support an injunction against breach of a contract to render personal services exclusively to plaintiff; it being sufficient if no certain pecuniary standard exists for the measurement of the damages.

"2. Injunction will issue to prevent a baseball player from violating his contract to serve a certain organization for a stipulated time, during which he is not to play for any other club, where he is an expert player, has been with the organization sufficiently long to have become thoroughly familiar with the team work, and is a most attractive drawing card for the public because of his great reputation for ability in the position which he fills.

"3. Lack of mutualtiy of remedy will not prevent an injunction against breach of a contract to render exclusive services as a ball player because the options of renewal and of terminating the contract on ten days' notice rest only with the employer, where such options expressly form part of the consideration for which the compensation is paid—at least, after the contract has been partly performed."

A recent case decided May 26, 1961, in the Court of Appeals of Texas and reported in 348 South Western 2d, 37, is

that of *Dallas Cowboys' Football Club* v. *Harris*, in which according to the headnotes the Court held:—

"2. Injunction. Injunctive relief will be granted to restrain violation by employee of negative covenants in personal service contract if employee is a person of exceptional and unique knowledge, skill and ability in performing the service called for in the contract."

"7. Injunction. Where one person agrees to render personal services to another, which requires and presupposes a special knowledge, skill and ability in employee, so that in case of default same service could not easily be obtained from others, his performance will be negatively enforced by enjoining its breach, and proof of a possibility of obtaining approval in service is not required as condition of relief."

"15. Monopolies. A contract whereby player agreed to play professional football for certain club for one year, club having option of renewal for another year, did not violate anti-trust laws.

"16. Master and Servant. A contract whereby player agreed to play professional football only for designated club for one year with option of renewal for another year was not so unreasonable and harsh as to be unenforceable in equity."

Another recently reported case is that of *Winnepeg Rugby Football Club* v. *Freeman*, 140 F. Supp., 365, in the United States District Court N. D. of Ohio E. D., in which it was held that where contracts between football players and foreign football club for services of the players were for services of special merit, were of peculiar and particular value to the club and contained covenants against playing for anyone else, where damages in case of breach were incapable of definite measurement and club was willing and able to fulfill its part of the contract, and where domestic club which had contracted with players after the foreign club had contracted with them had, before contracting with the players, heard statements and rumors to effect that players had already contracted with the foreign club, district court would exercise its discretion in favor of preliminarily enjoining performance of contract between players and the domestic club.

Jones, Chief Judge, in his opinion said:—

"There are a few certain key cases which have been con-

trolling authority in controversies of this character. If the present facts fit into the essentials for injunctive relief the plaintiff should prevail.

"Starting with *Lumley* v. *Guye*, 118 Eng. Reprint, 749 and *Lumley* v. *Wagner*, 42 Eng. Reprint, 687, continuing with the principles there set down through the *Philadelphia Ball Club* v. *Lajoie case*, 202 Pa., 210, 51 A., 973, 58 L. R. A., 227 and *Warner Bros. Pictures, Inc.* v. *Nelson (Bette Davis)* (1937), 1 K. B., 209 (1936), 3 All. E. R., 160, and other cases we finally find, for us, authoritative pronouncement approving the principles of such cases in our own Court of Appeals in *Bach* v. *Friden Calculating Mach. Co.*, 6 Cir., 155 F. 2d, 361, at page 366. Thus it will be found that these principles effectively apply to such contracts as are here under consideration in view of the fact that the law of Manitoba which controls is conceded to be the same as would apply in a like case here.

"Are the essentials present here to support injunctive relief as prayed? It is my considered judgment that they are and I so find the facts and circumstances in evidence responding to those essential requirements.

"The contracts were for services of special merit; they were of peculiar and particular value to the plaintiff; there was a covenant against playing for anyone else; damages in case of breach were incapable of definite measurement; the plaintiff is willing and able to fulfil its part of the contract."

Of considerable interest is the further comment of Judge Jones:—

"Ordinarily and under disinterested circumstances I would give great weight to the judgment of Coach Brown as to the value of a football player. He testified that the two defendants only were 'good' football players but not specially skilled, although the consideration for their contracts with the Browns seemed to me to recognize in them (especially Freeman) rather promising talent of something more than ordinary skill for a beginner in professional football (although they had to make the team to get the consideration called for by those contracts)."

The Judge concludes:—

"While the Browns' evidence was that they had no positive knowledge of the defendant players' contracts with the Winni-

peg Club, yet they had heard statements and rumors to that effect, as I think, sufficient to put them upon inquiry and notice. The effect of having the players sign contracts to play with the Browns and in fact having them join the team for practice in such circumstances is to have participated in securing the breach of the plaintiff's contracts and accordingly should be made subject to injunctive process."

Other cases in support of the position taken by plaintiff are *American League Baseball Club of New York* v. *Pasquel*, 63 N. Y. S. 2d, 537 (1946) ; *American Association* v. *Manrodt*, 23 N. Y. Supp. 2d, 858 (1940) ; *Comstock* v. *Lopokowa*, 190 Fed. Rep., 599, Circuit Court S. D. N. Y. (Dancers).

Professional players in the major baseball, football, and basketball leagues have unusual talents and skills or they would not be so employed. Such players, the defendant Barnett included, are not easily replaced.

The right of the plaintiff is plain and the wrong done by the defendants is equally plain, and there is no reason why the Court should be sparing in the application of its remedies.

Damages at law would be speculative and uncertain and are practically impossible of ascertainment in terms of money. There is no plain, adequate and complete remedy at law and the injury to the plaintiff is irreparable.

Professional baseball, football, and basketball require regulations for the protection of the business, the public and the players, and so long as they are fair and reasonable there is no violation of the laws on restraint of trade. The evidence before this Court does not show any unfair or unreasonable act on the part of the plaintiff and the Court concludes that the claim of the defendant that the contract is in restraint of trade is without merit.

This Court also concludes from the evidence that the plaintiff is authorized to bring this action in this court under the laws of Ohio, and is properly before this Court.

The Court finds in favor of the plaintiff on all issues joined and permanent injunctions as requested for the 1961-1962 basketball playing season are decreed. Thereafter the said injunctions shall be dissolved. O. S. J.