**INDEPENDENT ENTERTAINMENT GROUP, INC., Plaintiff,**

**and**

**Proserv, Inc., Plaintiff–Intervenor,**

**v.**

**NATIONAL BASKETBALL ASSOCIATION, et al., Defendants.**

**No. CV 91–4307–AAH.**

United States District Court, C.D. California.

May 20, 1994.

Frank Rothman, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, CA, Shepard Goldfein, Skadden, Arps, Slate, Meagher & Flom, New York City, Lois D. Thompson, Proskauer, Rose, Goetz & Mendelsohn, Los Angeles, CA, for defendant National Basketball Ass'n, except for Chicago Professional Sports, Ltd. Partnership; Jeffrey A. Mishkin, Joel M. Litvin, Margot S. Rubin, Nation-

al Basketball Ass'n, New York City, of counsel.

Mark S. Levinstein, Steven R. Kuney, Kevin M. Hodges, Kevin M. Downey, John E. Schmidtlein, Williams & Connolly, Washington, DC, for plaintiff-intervenor Proserv, Inc.

Maxwell M. Blecher, Harold R. Collins, Jr., Mark D. Baute, Blecher & Collins, Harris Tulchin, Tulchin & Associates, Larry Russ, McMurry, Russ, August & Kabat, Los Angeles, CA, for plaintiff Independent Entertainment Group, Inc.

Charles Stern, Katten, Muchin, Zavis & Weitzman, Los Angeles, CA, Stephen D. Libowsky, Katten, Muchin & Zavis, Chicago, IL, for defendant Chicago Professional Sports, Ltd. Partnership.

## FINAL ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING ALL COUNTS OF PLAINTIFFS' COMPLAINTS

HAUK, District Judge.

The defendants herein have moved this Court for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. After considering all the papers submitted by the parties and hearing oral argument in support of and in opposition to defendants' motion, the Court hereby grants defendants' motion and dismisses the case based on the following Uncontroverted Facts:

### UNCONTROVERTED FACTS

*The Parties*

1. Plaintiff Independent Entertainment Group, Inc. ("IEG") is in the business of promoting, organizing and producing entertainment events. Plaintiff–Intervenor ProServ, Inc. ("ProServ") is a sports marketing and management corporation that produces and markets events involving professional athletes.

2. The Court specifically notes that neither the NBA Players Association ("Players Association" or "NBPA") nor any individual NBA player is a plaintiff in this action. Moreover, no NBA player under contract with an NBA member team has filed a declaration in support of plaintiffs' opposition to defendants' motion for summary judgment.

3. Defendant National Basketball Association ("NBA" or "League") operates a league consisting of 27 member teams, each of which holds a franchise to operate a professional basketball team in a particular geographic location. (Litvin Decl. ¶ 2) The NBA, on behalf of its member clubs, annually coordinates an 82–game regular season schedule, followed by playoffs and a championship series. It is through the NBA that the member teams set rules and regulations for games, fashion playing schedules, and engage in year-round marketing and promotion of "NBA basketball." (Litvin Decl. ¶ 3) [1]

*Plaintiffs' Allegations*

4. In or about 1989, plaintiff IEG and plaintiff ProServ decided to stage annually for television broadcast, on a pay-per-view basis, a one-on-one basketball entertainment event, to be known as "King of the Court." This event was to be played after the conclusion of the NBA season by prominent and highly skilled NBA basketball players under contract with NBA teams.

5. Plaintiffs allege that two NBA players, Michael Jordan and Earvin "Magic" Johnson, agreed to participate in King of the Court, subject to NBA approval. The game was to take place in June 1990, shortly after the conclusion of the 1989–1990 NBA playoffs.

6. Plaintiffs, through their representatives, contacted the NBA concerning the production of King of the Court. The NBA refused to approve the participation of Jordan and Johnson, or any other NBA player, in King of the Court, "pursuant to agreements among the defendants and the National Basketball Players Association." (ProServ Complaint ¶ 20)

7. Plaintiffs allege that the NBA's refusal to allow NBA players to participate in King of the Court violates Section 1 and Section 2

---

1. Also named as defendants are the 27 NBA member teams and NBA Properties, Inc., a corporation owned by the NBA member teams which, *inter alia*, markets and licenses items bearing NBA member logos and items bearing the names and likenesses of NBA players.

of the Sherman Act, 15 U.S.C. §§ 1 and 2. Specifically, plaintiffs contend that the NBA and its member teams have unreasonably restrained trade and monopolized, or attempted to monopolize, "the market for 'major league' basketball events, including the sale of all forms of television rights that showcase 'major league' professional basketball players, and the market for major league basketball players." (Noll Decl. ¶ 9; Plaintiffs Joint Statement of Genuine Issues of Material Fact In Opposition To Defendants' Motion For Summary Judgment 5)

*The Contractual Relationship Between NBA Member Teams and NBA Players*

8. The NBA is the multiemployer collective bargaining representative for all NBA member teams. The Players Association is the duly authorized exclusive collective bargaining representative of all NBA players. (Litvin Decl. ¶ 10) As a matter of labor law, all agreements between NBA member teams and NBA players must be negotiated exclusively between the NBA as the exclusive representative of NBA member teams and the Players Association as the exclusive representative of all NBA players. *See* Section 8(a) of the National Labor Relations Act, 29 U.S.C. § 158(a).

9. Thus, the 1988 Collective Bargaining Agreement (the "1988 CBA" or the "CBA") is a contract between NBA players and NBA member teams that sets forth the terms and conditions of employment for all NBA players. Included in the CBA is the Uniform Player Contract ("UPC"), the standard contract between a team and player. Each NBA player must sign the UPC before he can play in the League. The 1988 CBA permits a player to negotiate with his team a limited number of defined amendments to the terms of the UPC, but in no case can teams or players amend the UPC in a way that is inconsistent with or alters any portion of the CBA. Each player, therefore, is bound both by an individual contract derived from the CBA as well as the CBA itself. (Litvin Decl. ¶ 11)

10. Under the 1988 CBA and its amendments, there are a number of contractual provisions and agreements which define the exclusive employment obligations of every NBA player. These provisions are:

a. *Article XX, Section 6 of the 1988 CBA:* By its terms, Article XX, Section 6 prohibits every NBA player from participating in any "off-season" basketball game unless it has been approved by the NBA and the NBPA, and sets forth the requirements that promoters of off-season games must satisfy to be eligible for such approval. These requirements include that: (i) all of the proceeds of the game are used for charitable purposes (the promoter must also guarantee that the game will generate at least $100,000 for charity), (ii) the game is not broadcast or cablecast on television and (iii) the players are not compensated for playing the game. (Litvin Decl.Exh. A at 00109–110)

b. *Paragraph 9 of the UPC:* Paragraph 9 of the UPC provides that an NBA players cannot play basketball for any competitive entity of any type during the term of employment and provides for the remedy of injunctive relief against players who attempt to play for any other entity. Paragraph 9 cannot be amended by any team or player.

c. *Paragraph 17 of the UPC:* Under Paragraph 17 of the UPC, a player may not engage in certain athletic activities, including playing basketball for any entity other than his team, without the written consent of his team. (*Id.* at 00159–60) Although paragraph 17 may be deleted or amended by agreement between the team and the player, the CBA expressly provides that no team or player can agree in his contract to alter or amend the terms of the UPC in a way that is inconsistent with any portion of the CBA, including Article XX, Section 6. (Article I, Section 6, 1988 CBA, Litvin Decl.Ex. A at 00035) Thus, as a matter of contract, no team could permit a player to play in an "off-season" basketball event that did not comply with Article XX, Section 6 of the CBA and receive both NBA and NBPA approval.

d. *The 1986 Group Licensing Agreement and the 1989 "Events Agreement":* The

1986 Group Licensing Agreement (the "1986 GLA") between the NBA and the NBPA primarily grants group licensing rights of the players' likenesses to the NBA. The 1986 GLA is specifically incorporated in the 1988 CBA at Article XXXII, Section 1 and UPC ¶ 18(b). Under the 1986 GLA, the NBPA retained the right to stage one off-season basketball event using NBA players to raise the money to defray union administrative expenses. The 1986 GLA was amended by the so-called 1989 Events Agreement, under which, among other things, the NBPA relinquished its right to put on one basketball event per year.

11. For purposes of this motion only, defendants have conceded that the above described provisions and agreements set forth the terms of exclusive employment of NBA players by NBA teams for the term of the players' employment. Further, for purposes of summary judgment only, defendants conceded that one or more of the above described provisions and agreements prevented an NBA player under contract from participating in King of the Court.

12. The stated term of an NBA player's contract is for the full calendar year. (UPC ¶ 1, Litvin Decl.Ex. A at 00152) Under the express provisions of the UPC, players have contractual obligations to their team and the League throughout the year. For example, in addition to the provisions specified above, an NBA player agrees on a year-round basis to avoid certain dangerous activities (UPC ¶ 17, Litvin Decl.Ex. A at 00159–60); to abide by the League's anti-drug program (Article XXXIII, 1988 CBA, Litvin Decl.Ex. A at 00139–49); to make certain promotional appearances for the League and his team (UPC ¶ 18(a), Litvin Decl.Ex. A at 00160 and Article I, Section 13, 1988 CBA, Ex. A at 00040–41) and for NBA Properties, Inc. (Article XXXII, Section 2, 1988 CBA, Ex. A at 00138); to have his picture taken by the League and his team (UPC ¶ 18(a), Litvin Decl.Ex. A at 00160); and to conduct himself at all times according to the highest standards of honesty, morality, fair play, and sportsmanship (UPC ¶ 5, Litvin Decl.Ex. A at 00154).

*The NBA's Rejection of "King Of The Court"*

13. It is undisputed that Michael Jordan and Magic Johnson were under contract to their respective NBA teams (the Chicago Bulls and the Los Angeles Lakers), and therefore subject to the 1988 CBA and its amendments, when plaintiffs sought to hire them for King of the Court. It is further undisputed that under the 1988 CBA and its amendments, Jordan and Johnson were bound by the exclusive services provisions and agreements set forth above and could not participate in King of the Court absent NBA approval.

14. Although the parties apparently dispute which specific provision of the 1988 CBA and its amendments the NBA relied on to refuse to permit the participation of NBA players in King of the Court, the defendants have conceded for purposes of its motion only that one or more of the exclusive employment obligations set forth in Paragraph 10 above prevented NBA players from playing for the plaintiffs.

*"Genuine Issues of Material Fact" Raised By Plaintiffs*

15. In opposing defendants' motion for summary judgment, plaintiffs submitted a "Joint Statement of Genuine Issues of Material Fact In Opposition To Defendants' Motion For Summary Judgment" ("Plaintiffs Joint Statement"). The Court finds that the factual issues raised by plaintiffs relate to issues not raised by defendants' in their summary judgment motion and, in any event, are not material to this Court's decision granting defendants' motion for summary judgment.

16. Specifically, for purposes of summary judgment only, defendants conceded that they are capable of conspiring for purposes of Section 1 of the Sherman Act. Plaintiffs' Joint Statement ¶ 1, therefore, does not raise a genuine issue of material fact. For purposes of summary judgment only, defendants conceded that the relevant markets are those alleged by plaintiffs. Plaintiffs' Joint Statement ¶ 2, therefore, does not raise a genuine issue of material fact. For purposes of summary judgment only, defendants conceded that they possess a monopoly and monopoly power in the relevant markets. Plaintiffs'

Joint Statement ¶ 6, therefore, does not raise a genuine issue of material fact. For purpose of summary judgment only, defendants conceded that NBA players could not play in King of the Court because of their exclusive employment obligations under the 1988 CBA, including the 1986 GLA and the 1989 Events Agreement. Plaintiffs' Joint Statement ¶¶ 9, 10, 11, 12, 15 and Plaintiffs' Additional Fact Nos. 1–16, therefore, do not raise genuine issues of material fact. For purposes of summary judgment only, defendants conceded that the alleged anticompetitive agreements between the NBA and the NBA Players Association have foreclosed plaintiffs from the relevant markets. Plaintiffs' Joint Statement ¶¶ 14, 16, 17, 18, and Plaintiffs' Additional Facts Nos. 17–19, 21, therefore, do not raise genuine issues of material fact. Finally, for purposes of summary judgment only, defendants conceded that they were not relying on legitimate business justifications in rejecting the King of the Court proposal. Plaintiffs' Additional Facts Nos. 20 and 22, therefore, do not raise genuine issues of material fact.

Based on the foregoing Uncontroverted Facts, the Court makes the following Conclusions of Law.

## CONCLUSIONS OF LAW

### Plaintiffs' Section 1 Claims

■ 1. Section 1 states that "[e]very contract, combination ... or conspiracy, in restraint of trade ... is declared to be illegal." 15 U.S.C. § 1. Read literally, Section 1 prohibits every agreement that restrains trade. *O.S.C. v. Apple Computer Inc.*, 792 F.2d 1464, 1467 (9th Cir.1986). Section 1, however, only prohibits agreements that *unreasonably* restrict competition. *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911).

■ 2. This Court finds that it is reasonable as a matter of law for the member teams of a professional sports league to require their player-employees to remain loyal to the team and the league and not work for any competing entity while they remain employed. *USFL v. NFL*, 634 F.Supp. 1155, 1188 (S.D.N.Y.1986); *Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir.1981), *cert.*

*denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *cf. NFL v. North American Soccer League*, 459 U.S. 1074, 1078–79, 103 S.Ct. 499, 501, 74 L.Ed.2d 639 (1982) (Rehnquist, J., dissenting from the denial of certiorari).

3. Professional athletes employed by a sports league, therefore, may lawfully be restricted during the term of employment from playing for any competitive entity. *E.g., Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 476 (9th Cir.1969); *American League Baseball Club v. Pasquel*, 187 Misc. 230, 63 N.Y.S.2d 537, 539–40 (Sup.Ct.N.Y.County 1946); *Central New York Basketball, Inc. v. Barnett*, 19 Ohio Op.2d 130, 181 N.E.2d 506, 517 (Ohio C.P. 1961); *Dallas Cowboys Football Club, Inc. v. Harris*, 348 S.W.2d 37, 42 (Tex.Civ.App. 1961).

4. Since professional athletes of a professional sports league are employees rather than independent contractors such as professional tennis players, I find that the court's decision in *Volvo North American Corp. v. Men's International Professional Tennis Council*, 857 F.2d 55 (2d Cir.1988), is irrelevant to this case. Although it would not affect the Court's decision, the Court also notes that plaintiffs have cited no case in which an exclusive employment agreement that applied only for the term of employment was struck down under the Sherman Act or was even subjected to a rule of reason analysis.

5. For purposes of defendants' motion, the Court finds that the exclusive employment obligations of NBA players are contained in the UPC, the 1988 CBA, Article XX, Section 6, the 1986 GLA and the 1989 Events Agreement. Since all of these agreements require exclusivity only while an NBA player is under contract, they are reasonable as a matter of law under Section 1 of the Sherman Act.

6. Plaintiffs have argued that the "term" of employment, *e.g.*, its duration, is not dictated by the availability of NBA players to perform their services for their respective clubs. This Court finds that the term of an employment contract is a matter of contract

interpretation for the Court, and that in this case NBA players sign player contracts that run for the entire calendar year. *See USFL v. NFL,* 634 F.Supp. at 1187–88 (availability in the "off-season" is irrelevant; contract terms control).

7. Moreover, the Court rejects plaintiffs' argument that they seek to use NBA players under contract only in the "off-season." Plaintiffs' revised market definition is for basketball events involving NBA players at any time during the calendar year. (Plaintiffs' Joint Statement ¶ 2) Thus, the Court finds that there is no meaningful distinction between the "off-season" and any other time during which an NBA player is not actually engaged in a game or practice for his team.

8. This Court also rejects plaintiffs' attempt to cast this case as an unlawful "restriction of output" of basketball events involving NBA players. NBA member teams may contract for the exclusive services of player-employees during the term of employment as a matter of law. While the natural effect of this lawful contractual relationship is to prevent third parties such as plaintiffs' from using NBA players under contract to produce more basketball events, any resulting effect is reasonable as a matter of law.

9. Because the exclusive employment by NBA member teams of NBA players is reasonable as a matter of law, summary judgment for defendants on plaintiffs' Section 1 claim is warranted.

*Plaintiffs' Section 2 Claims*

10. Section 2 of the Sherman Act, 15 U.S.C. § 2, states in part that "[e]very person who shall monopolize, or attempt to monopolize ... any part of ... commerce ... shall be deemed guilty of a felony." 15 U.S.C. § 2. The offense of monopolization has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *California Computer Prods., Inc. v. IBM Corp.,* 613 F.2d 727, 735 (9th Cir.1979).

11. With respect to the first element the court assumes, for purposes of this motion only, that defendant has monopoly power in the relevant market as defined by plaintiffs.

12. With respect to the second element, Section 2 is aimed only at punishing an "individual or entity that uses *'predatory'* means to attain a monopoly, or to perpetuate a monopoly after the competitive superiority that originally gave rise to the monopoly has faded." *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 547 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992) (emphasis added).

13. A monopolist, "no less than another competitor, is permitted and indeed encouraged to compete aggressively on the merits." *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 547 (9th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992).

14. Conduct that is reasonable under Section 1 of the Sherman Act should not be considered anticompetitive conduct under Section 2. *Williams v. I.B. Fischer Nevada,* 999 F.2d 445, 448 (9th Cir.1993). Accordingly, because the exclusive employment obligations embodied in the challenged agreements are reasonable as a matter of law under Section 1 of the Sherman Act, these restrictions cannot form the basis of a Section 2 claim.

15. Alternatively, this Court finds that exclusive personal services contracts with employees cannot be "predatory" as a matter of law under Section 2 of the Sherman Act. By analogy, a monopolist cannot be sued for "predatory" hiring of employees unless they are hired *solely* to keep them from a rival. *Universal Analytics, Inc. v. MacNeal–Schwendler Corp.,* 914 F.2d 1256, 1258–59 (9th Cir.1990); *accord Midwest Radio Co. v. Forum Publishing Co.,* 942 F.2d 1294, 1297–98 (8th Cir.1991). Here, it is indisputable that the NBA did not hire Jordan or Johnson solely to prevent them from playing for plaintiffs.

16. Further, a monopolist does not have to share its employees with a com-

petitor even if it had done so in the past and even if its refusal to share harms plaintiffs' business. *See, e.g., Olympia Equip. Leasing Co. v. Western Union Tel. Co.,* 797 F.2d 370, 379 (7th Cir.1986) (monopolist's exclusivity contracts with its sales force cannot violate Section 2), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987). A monopolist may engage in marketing strategies, including the sale and promotion of its own product, that benefits itself and excludes competitors without fear of antitrust reprisal. *See California Computer Prods., Inc. v. IBM Corp.,* 613 F.2d 727 (9th Cir.1979) (a monopolist has no duty to help competitors survive or expand); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 276, 286 (2d Cir. 1979) (a firm "may generally bring its products to market whenever and however it chooses" and may benefit its own affiliates over outsiders), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

■ 17. Indeed, even if defendants intended to exclude plaintiffs from the alleged market by entering into exclusive employment obligations with their player-employees, Section 2 is not violated because the intent to exclude competitors through lawful means cannot be predatory as a matter of law. *See California Computer Prods.,* 613 F.2d at 744; *Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.,* 935 F.2d 1469 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992); *Rural Tel. Serv. Co. v. Feist Publications, Inc.,* 957 F.2d 765 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 490, 121 L.Ed.2d 429 (1992).

18. It appears to this Court that this case, at bottom, is about plaintiffs' attempt to free-ride on the NBA's investment in its star players and in rebuilding the League during the 1980's. Exclusive employment agreements lawfully prevent such free-riding as a matter of law. *See USFL v. NFL,* 634 F.Supp. at 1188 n. 27.

19. Finally, because plaintiffs have not alleged any conduct which could support a monopolization claim under Section 2, plaintiffs' attempted monopolization and conspiracy to monopolize claims must also fail. *E.g.,*

*California Computer Products v. IBM Corp.,* 613 F.2d 727, 738 (9th Cir.1979).

### The NBA's Non–Statutory Labor Exemption Defense

■ 20. The Court, after oral argument and full briefing by the parties, previously denied defendants' motion for summary judgment arguing that the defendants' restrictions on off-season play by NBA players were immune from antitrust attack under the non-statutory labor exemption. The Court hereby incorporates that decision in the present Order. Specifically, the Court found that defendants, as a matter of law, had not satisfied one of the three elements of the non-statutory labor exemption as set forth in *Mackey v. NFL,* 543 F.2d 606 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), namely that the alleged affects only the parties to the collective bargaining relationship. The Court found that while the restrictions on off-season play as contained in the 1988 CBA were a mandatory subject of collective bargaining and the product of bona fide arm's-length bargaining, there was a genuine issue of material fact as to whether the off-season restrictions primarily affected only the players as opposed to third parties.

### Plaintiffs' Tortious Interference Claims

21. Because the claims over which the Court had original jurisdiction are being dismissed before trial, the Court also dismisses the pendent state-law claims without prejudice in order to avoid making needless decisions of state law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); 28 U.S.C. § 1367(c)(3).

### CONCLUSION

Based on the foregoing Uncontroverted Facts and Conclusions of Law, the Court concludes as follows:

1. Article XX, Section 6 of the 1988 CBA, the 1986 GLA and the 1989 Events Agreement are exclusive employment arrangements with NBA players that cannot be unreasonable or predatory under the Sherman Act as a matter of law.

2. Accordingly, pursuant to Rule 56(c), Counts I through V of ProServ's Complaint and Count One of IEG's Complaint, alleging violations of Sections 1 and 2 of the Sherman Act, are dismissed with prejudice.

3. In addition, Count VI of ProServ's Complaint and Count Two of IEG's Complaint, alleging tortious interference with contractual relations or prospective advantage, are dismissed without prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this order on all counsel of record.