[Civ. Nos. 25164, 26363, 26621. First Dist., Div. Two. Aug. 19, 1969.]

LEMAT CORPORATION, Plaintiff, Cross-defendant and Appellant, v. RICHARD F. BARRY III, Defendant, Cross-complainant and Appellant.

(Consolidated Appeals.)

Luther J. Avery, Robert J. Dunn, Bancroft, Avery & Mc-Alister, Richard J. Archer and Morrison, Foerster, Holloway, Clinton & Clark for Plaintiff, Cross-defendant and Appellant.

Loeb & Loeb, Herzstein, Maier & Carey, Robert A. Holtzman and Paul C. Maier for Defendant, Cross-complainant and Appellant.

TAYLOR, J.—These consolidated appeals[1] involve an action for injunctive relief brought by the owner and operator of a professional basketball team, Lemat Corporation (hereafter Lemat), against one of its former players, defendant Richard F. Barry III (hereafter Barry). Lemat appeals from a portion of the final judgment in its favor granting a one-year injunction (No. 26363), contending that it was entitled to injunctive relief for seven years, as well as damages. Barry cross-appeals from the judgment (No. 26621), contending only that the trial court's findings on damages should be stricken.[2]

Lemat is a Delaware corporation qualified to do business in the State of California, and also is the sole general partner of a limited partnership that owns and operates a professional basketball team under the name of the San Francisco Warriors (hereafter Warriors) under a franchise from the National Basketball Association (hereafter NBA). NBA is a joint venture that operates a professional basketball league in the United States, consisting of member teams who play professional basketball in the various cities.

Barry is a professional basketball player whose great talents and abilities draw substantial attendance to the games in which he participates. Barry entered his first contract with the Warriors for the 1965-1966 season[3] in May 1965, prior to his graduation from college. At that time, he sought advice from his coach who had considerable experience in profes-

---

[1] Initially, there was a third matter, No. 25164, Barry's appeal from the order of August 8, 1967, granting a preliminary injunction to September 1968. However, that appeal is now moot and hereby dismissed (*Paul v. Milk Depots, Inc.*, 62 Cal.2d 129, 134 [41 Cal.Rptr. 468, 396 P.2d 924].)

[2] Although the permanent injunction granted by the final judgment expired on September 30, 1968, long before the consideration of the appeals, the issues here raised are of sufficient public interest and, therefore, not moot (*County of Madera v. Gendron*, 59 Cal.2d 798, 804 [31 Cal.Rptr. 302, 382 P.2d 342, 6 A.L.R.3d 555]).

[3] The professional basketball season does not begin until October and team training begins in August.

sional basketball, both as a player and coach. On or about August 29, 1966, Barry entered into another contract with the Warriors. This contract contained paragraph 24, set forth in the footnote below,[4] the so-called "option" or "reserve clause" that is the crux of this dispute.

Barry played professional basketball for the Warriors during the 1966-1967 season and performed all of the covenants and conditions of the contract and was paid the full compensation of $75,000 provided for by the contract. On June 20, 1967, pursuant to paragraph 24, the Warriors delivered and mailed to Barry a proposed contract for the 1967-1968 playing season at a proposed compensation of $75,000 a year. On or about June 22, 1967, Barry received this contract, but did not sign or return it.

On June 19, 1967, Barry granted to Charles E. "Pat" Boone (hereafter Boone) and S. D. Davidson an option to acquire his services as a professional basketball player for the 1967-1968 season, and received an assignment for the transfer of a certain undivided interest in the Oakland franchise of the American Basketball Association (hereafter ABA), a Delaware corporation organized and existing for the purposes, among others, of forming, managing, operating, and advising a professional basketball league with member clubs in various cities of the United States. Thereafter, pursuant to the option, on September 29, 1967, Barry signed an ABA standard player contract with Oakland Basketball, Inc. (hereafter Oaks), the owner and operator of the ABA franchise for Oakland, California, of a professional basketball team under the name of the Oaks. This agreement provided for compensation of $75,000 per year, plus an amount equal to the lesser of 5 percent of all gross gate receipts received by the club per year in excess of $60,000, or $15,000. It also provided for liquidated damages of $750,000 if Barry did not sign the contract or perform thereunder and contained a renewal option provi-

---

[4] "24. On or before September 1 next following the last playing season covered by this contract and renewals and extensions thereof, the Club may tender to the Player a contract for the next succeeding season by mailing the same to the Player at his address shown below, or if none is shown, then at his address last known to the Club. If the Player fails, neglects, or omits to sign and return such contract to the Club so that the Club receives it on or before October 1st next succeeding, then this contract shall be deemed renewed and extended for the period of one year, upon the same terms and conditions in all respects as are provided herein, except that the compensation payable to the Player shall be the sum provided in the contract tendered to the Player pursuant to the provisions hereof, which compensation shall in no event be less than 75% of the compensation payable to the Player for the last playing season covered by this contract and renewals and extensions thereof."

sion substantially similar to that contained in the NBA agreement. The same day, the Oaks executed another contract agreeing to indemnify Barry for any liabilities or other losses, including attorney fees, that he might incur by reason of his executing the option or the contract with the Oaks.

On June 22, 1967, Lemat filed its complaint in this action. On August 8, 1967, Lemat obtained a preliminary injunction preventing Barry from playing professional basketball except for the Warriors until September 30, 1968. Thus, Barry "sat out" the 1967-1968 season, and was paid $75,000 by the Oaks.

The matter was tried in July 1968. The court found the facts as stated above and further found that if Barry had fulfilled his contract and played for the Warriors during the 1967-1968 season, their gate receipts would have grown by at least 25 percent (the average figure for growth of gate receipts in the NBA) to approximately $750,000, rather than the approximately $346,000 received that season. Therefore, the Warriors suffered a gross attendance loss of $404,000, from which amount must be deducted additional expenses of $48,480, for a net loss of $356,000. If Barry had played for the Oaks during the 1967-1968 season, the Warriors' gate receipts for that season would have been even less.

The court further found that because the Warriors had primarily built their style of play and public image around Barry, and the special, unique, unusual and extraordinary character of Barry's services, the loss to the Warriors of his services for a second year could not be adequately compensated for in money. The Warriors and the Oaks directly compete with each other for attendance within the same market and if Barry were permitted to play for the Oaks during the term of his contract, the Warriors would suffer irreparable injury.

The court concluded that: 1) Barry's August 29, 1966 contract with the Warriors was a contract of adhesion but did not contain any ambiguity to be resolved against the Warriors; 2) paragraph 24 of the contract contained a valid renewal option for Barry's services for one additional year on the same terms and conditions as the first year, except for salary, and was neither uncertain, unfair, unjust, unconscionable nor lacking in mutuality of remedy; 3) the compensation of no less than 75 percent of the $75,000 specified for the first year was adequate and reasonable compensation for the services to be performed by Barry and for his agreement not to play for anyone else for an additional year; 4) the contract

bound Barry to play for a second year after the expiration of the initial year as a result of the Warriors' exercise of the renewal option and this was the understanding of the parties. It was not their understanding that Barry was merely to be prohibited from signing a contract with another team in the NBA and was free to go to a team in another league after playing for the Warriors for one year; 5) the limited restriction on Barry's freedom to contract imposed by paragraph 24 was reasonable and necessary to provide that stability and continuity required for efficient management of a sports league and in the long run redounds to the benefit of both players and teams; 6) Barry's failure to play out the option for the additional year with the Warriors was a deliberate breach of his contractual obligations; 7) Barry's breach of contract did not extend the term of the contract or otherwise broaden the Warriors' rights; and 8) although Barry's breach damaged the Warriors in the sum of at least $356,000, they were not entitled to judgment therefor. Accordingly, the trial court entered its final judgment dated November 6, 1968, enjoining Barry from playing for any other team until September 30, 1968.

## I. Lemat's Appeal (No. 26363)

Lemat contends that it was entitled to a permanent injunction for seven years, as well as damages in the amount found by the trial court.

Lemat first argues that the court erred in granting injunctive relief for only the one year remaining of the two-year term of the contract. We think the court's construction of paragraph 24 of the option provision, as providing for a second year in addition to the initial year, is an eminently reasonable one that follows the well-thought out decision in *Central New York Basketball, Inc.* v. *Barnett* (1961) 88 Ohio L.Abs. 40, 19 Ohio Ops.2d 130 [181 N.E.2d 506]), a case almost on all fours with the instant one. In *Barnett,* the owner of an NBA franchised professional basketball team sought to enforce a substantially similar renewal option[5]

---

[5]The option provision there involved read as follows: "22. (a) On or before September 1st (or if a Sunday, then the next preceding business day) next following the last playing season covered by this contract, the Club may tender to the Player a contract for the term of that season by mailing the same to the Player at his address following his signature hereto, or if none be given, then at his last address of record with the Club. If prior to the November 1 next succeeding said September 1, the player and the Club have not agreed upon the terms of such contract, then on or before 10 days after said November 1, the Club shall have the right by written notice to the Player at said address to renew this con-

against a player who, like Barry, after the first year, entered into an agreement to play with a team franchised by the ABA. The court held that the reasonable practical construction of the renewal option was that the club could renew the player's contract for an additional year,[6] and that so interpreted, the renewal provision did not lack mutuality and was supported by sufficient consideration.[7] We think the identical reasoning applies here.

Lemat, however, argues that while *Barnett* may be an accurate statement of the law of Ohio, California Labor Code section 2855 (and the related provisions of Civil Code section 3423 and Code of Civil Procedure section 526) indicate a public policy that compels a different result in this instance. Lemat contends that public policy expressed in these California statutes (set forth, so far as pertinent, in the footnote below)[8] requires the inclusion of an implied covenant of seven years in every contract for unique personal services, where the minimum compensation is not less than $6,000 per annum and, therefore, it was entitled to a permanent injunction for seven years.

---

tract for the period of one year on the same terms, except that the amount payable to the Player shall be such as the Club shall fix in said notice; provided, however, that said amount shall be an amount payable at a rate not less than 75% of the rate stipulated for the preceding year.''

[6]The court specifically rejected the argument put forth by the competing team, that the renewal provision applies to the whole contract and, therefore, the contract was one for perpetual services and consequently void. Lemat does not make a similar argument here.

[7]The court said at page 512: '' '. . . The authorities are to the effect that so long as there is consideration for the obligation of the defendant, it is not essential that there be mutuality of obligation between plaintiff and defendant in order to sustain a right of action in the plaintiff against the defendant for a breach of such obligation; . . .' ''

[8]Labor Code section 2855: ''A contract to render personal service, other than a contract of apprenticeship as provided in Chapter 4 of this division, may not be enforced against the employee beyond seven years from the commencement of service under it. Any contract, otherwise valid, to perform or render service of a special, unique, unusual, extraordinary, or intellectual character, which gives it peculiar value and the loss of which cannot be reasonably or adequately compensated in damages in an action at law, may nevertheless be enforced against the person contracting to render such service, for a term not to exceed seven years from the commencement of service under it.''

Civil Code section 3423 provides, so far as pertinent: ''An injunction cannot be granted: . . . .

''To prevent the breach of a contract, other than a contract in writing for the rendition or furnishing of personal services from one to another where the minimum compensation for such service is at the rate of not less than six thousand dollars per annum and where the promised service is of a special, unique, unusual, extraordinary or intellectual character, which gives it peculiar value the loss of which cannot be reasonably or

We do not agree. In the first place, the language of Labor Code section 2855 is clearly language of limitation; the same is true of the related language in the Civil Code and Code of Civil Procedure. In the second place, the contract here was for a maximum period of two years, and did not contain six separate renewal options to extend the term of employment for successive periods of a year at successively higher salaries, as in *Warner Bros. Pictures, Inc.* v. *Brodel,* 31 Cal.2d 766 [192 P.2d 949, 3 A.L.R.2d 691], and *De Haviland* v. *Warner Bros. Pictures, Inc.,* 67 Cal.App.2d 225 [153 P.2d 893], cited by Lemat. In *Houston Oilers, Inc.* v. *Neely,* 361 F.2d 36, likewise the injunction was confined to the three-year period covered by the contract. ██ Furthermore, the rationale underlying the enforcement of negative covenants in contracts involving the unique personal services of star performers and athletes, is that the employer has contracted for the exclusive right to display the "star" for a given period. That no other entrepreneur may display the particular star during the period contracted for is part of the right for which the employer has bargained and has compensated the star (*Lumley* v. *Wagner,* 42 Eng.Rep. 687).[9]

The trial court found that the contract here was one of adhesion and as such must be strictly construed against Lemat. ██ Furthermore, any agreement that limits a per-

---

adequately compensated in damages in an action at law, the performance of which would not be specifically enforced; . . ."

Code of Civil Procedure section 526 provides, so far as pertinent: "An injunction may be granted in the following cases: . . . .

"To prevent the breach of a contract (other than a contract in writing, for the rendition or furnishing of personal service from one to another where the minimum compensation for such service is at the rate of not less than six thousand dollars per annum, and where the promised service is of a special, unique, unusual, extraordinary or intellectual character which gives it peculiar value the loss of which cannot be reasonably or adequately compensated in damages in an action at law) the performance of which would not be specifically enforced; . . ."

[9] Although the English courts appear to be more inclined to enforce negative covenants (see Tannenbaum, *Enforcement of Personal Service Contracts in the Entertainment Industry,* 42 Cal. L.Rev. 18), we doubt that they would agree with Lemat's interpretation of the contract which, in our view, would condemn professional ball players to the involuntary servitude repugnant to the Thirteenth Amendment to the United States Constitution (*Gardella* v. *Chandler* (2d Cir. 1949) 172 F.2d 402, 409; see also Pierce, *Organized Professional Team Sports and the Antitrust Laws,* 43 Cornell L.Q. 566, and 62 Yale L.J. 622-636). We also note, as one article points out, while the enforcement of longer option periods may be proper in the kindred motion picture industry cases, the services rendered by motion picture players are of a different nature, usually rendered over a longer period of time and compensated for by much larger money amounts, as well as by management rights (see 81 Harv. L.Rev. 418, 419).

son's ability to follow his vocation must be strictly construed (*Holdeen* v. *Ratteree* (N.D.N.Y. 1958) 166 F.Supp. 694). Lemat has not cited (nor have we been able to find) a single decision that would support its position. The authorities are to the contrary (*Foxx* v. *Williams* 244 Cal.App.2d 223 [52 Cal.Rptr. 896]; *Lowe's, Inc.* v. *Cole* (9th Cir. 1950) 185 F.2d 641). ▆ We hold that the trial court properly concluded that Barry's breach could not enlarge Lemat's rights to an injunction beyond the term of the contract. As stated in *Machen* v. *Johansson*, 174 F.Supp. 522, at page 529, footnote 8: "Surely, had the contract been performed, he [the employer] would not have been entitled to deny defendant the right to perform for others beyond the date contracted for. A breach of the contract cannot broaden his right."

Lemat's remaining contention that it is entitled to damages, in addition to the injunction, is likewise not supported by any authority. ▆ The general rule is that a plaintiff in an injunction suit is entitled to no more than relief consisting of an injunction against future injury and damages for past injury (*Harvey* v. *White*, 213 Cal.App.2d 275 [28 Cal.Rptr. 601]). It is well settled that a plaintiff cannot obtain equitable relief commensurate with its claim of rights and damages in addition thereto (*Abbott* v. *76 Land & Water Co.*. 161 Cal. 42 [118 P. 425]; *Thresher* v. *Clark*, 45 Cal.App. 518 [188 P. 55]).

The out-of-state authorities cited by Lemat do not support its unique contention. *Mantell* v. *International Plastic Harmonica Corp.*, 141 N.J.Eq. 379 [55 A.2d 250, 173 A.L.R. 1185], merely points out that a court of equity may award damages for a breach based on losses suffered prior to the preliminary injunction. *W. T. Grant Co.* v. *Indian Trail Trading Post, Inc.* (Ky.App. 1968) 423 S.W.2d 251, held that where equity will not, for reasons of economic waste, decree the removal of an excessive portion of a structure, it may in lieu award damages. Similarly, *Weisbrodt* v. *Norris* (1957) 332 Ill.App. 279 [75 N.E.2d 50], held that the trial court has discretion to award damages in lieu of the injunctive relief sought, when it deems an injunction or specific performance unduly onerous or incapable of enforcement.

We need not discuss the matter in great detail, as it is clear from the pleadings and the pretrial order that Lemat's request for relief was in the alternative. Although the request for damages was first made at the trial and the trial court ruled that the question was properly before it, no effort was

made to amend the pleadings to conform to proof or other-wise. The record clearly indicates that the trial court's denial of damages was based on its view that the remedies sought should be considered as alternatives. Lemat's claim for damages could acquire significance only if its request for injunctive relief was denied or was found to be not appropriate under the circumstances (*Brown Derby Hollywood Corp.* v. *Hatton*, 61 Cal.2d 855, 858 [40 Cal.Rptr. 848, 395 P.2d 896]).

Even assuming that the court could have granted damages pursuant to Code of Civil Procedure section 580, the evidentiary and logical basis of the trial court's finding here is arguable. As noted in *Central New York Basketball, Inc.* v. *Barnett, supra*, damages in a situation of this kind are speculative and uncertain and practically impossible to ascertain. ■ We hold that the trial court properly concluded that Lemat was entitled to a permanent injunction until September 30, 1968, but was not entitled to injunctive relief beyond the term of the contract or damages in addition to the injunctive relief. Accordingly, the various issues raised by the parties concerning the enforceability and legality of the contract or the application of the federal and state antitrust laws require no discussion. We turn briefly to Barry's cross-appeal.

## II. BARRY'S CROSS-APPEAL (No. 26621)

As indicated above, the only contention on the cross-appeal is that the court's finding on damages should be stricken as surplusage. As we have already noted in our discussion of Lemat's contention concerning damages, the trial court here properly concluded that damages could not be awarded. Accordingly, the finding as to the amount of damages is surplusage and should be stricken (*Baglione* v. *Leué*, 160 Cal. App.2d 731, 733-734 [325 P.2d 471]; *Alonso* v. *Hills*, 95 Cal. App.2d 778, 789 [214 P.2d 50]).

The appeal in No. 25164 is dismissed[10] and the judgment in Nos. 26363 and 26621 is affirmed. Each party to bear his own costs on appeal.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing in Nos. 26363 and 26621 was denied September 18, 1969.

---

[10]The dismissal of an appeal is in effect an affirmance of the judgment (Code Civ. Proc., § 955). This is the proper disposition of the preliminary injunction here as in affirming the permanent injunction, the merits of the case have been reached (cf. *Paul* v. *Milk Depots, Inc., supra*.)