[Civ. No. 69060. Second Dist., Div. Seven. Sept. 17, 1984.]

MOTOWN RECORD CORPORATION et al.,
Plaintiffs and Respondents, v.
TINA MARIE BROCKERT et al., Defendants and Appellants.

**COUNSEL**

Engel & Engel, Donald S. Engel, James P. Cinque and Mark D. Passin for Defendants and Appellants.

Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, Alan G. Dowling, Timothy J. Harris and Lilianne G. Chaumont for Plaintiffs and Respondents.

## OPINION

**JOHNSON, Acting P. J.**—This appeal arises from a contract dispute between Motown Record Corporation (Motown) and Jobete Music Company, Inc. (Jobete) and singer, songwriter Tina Marie Brockert, known professionally as Teena Marie. (See also *Motown Record Corp.* v. *Superior Court* (1984) 155 Cal.App.3d 482 [202 Cal.Rptr. 227].)

Teena Marie appeals from a preliminary injunction restraining her from performing her singing and songwriting talents for anyone other than Motown and Jobete until their contracts expire. At the heart of this appeal is an issue which has received considerable attention in law reviews but has never been addressed by the appellate courts. ▪ The issue is whether a clause in a personal services contract giving the employer the option to pay the employee a minimum of $6,000 a year satisfies the statutory minimum compensation requirement for an injunction restraining breach of the contract.[1] (See, e.g., Note, *Statutory Minimum Compensation and the Granting of Injunctive Relief to Enforce Personal Services Contracts in the Entertainment Industries: The Need for Legislative Reform* (1979) 52 So.Cal.L.Rev. 489, (hereafter *Statutory Minimum Compensation*); Tannenbaum, *Enforcement of Personal Service Contracts in the Entertainment Industry* (1954) 42 Cal.L.Rev. 18 (hereafter Tannenbaum); Light, *The California Injunction Statute and the Music Industry: What Price Injunctive Relief?* (1982) 7 Colum. J. Art & L. 141, (hereafter Light); Schlesinger, *Six Thousand Dollars Per Year* (Dec. 1968) Bev. Hills Bar J. 25 (hereafter Schlesinger).)

We have concluded this option clause does not satisfy the statutory requirement of minimum compensation.

### FACTS AND PROCEEDINGS BELOW

In 1976, Teena Marie entered into contracts as a recording artist and songwriter with Motown and Jobete respectively. At the time she signed these contracts she was an unknown in the music business. Her experience

---

[1]Civil Code section 3423 provides in relevant part: "An injunction cannot be granted:
". . . . . . . . . . . . . . . . . . .

"Fifth—To prevent the breach of a contract, other than a contract in writing for the rendition or furnishing of personal services from one to another where the minimum compensation for such service is at the rate of not less than six thousand dollars per annum and where the promised service is of a special, unique, unusual, extraordinary or intellectual character, which gives it peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, the performance of which would not be specifically enforced. . . ."
Code of Civil Procedure section 526 is virtually identical.

consisted of singing with local bands at weddings, parties, and shopping centers and roles in school musicals. She had written some songs but none had been recorded or released commercially.

The Motown and Jobete contracts were admitted into evidence at the hearing on the preliminary injunction. Each contract was for an initial period of one year and granted the companies six options to renew the agreements for one-year periods on the same terms applicable to the initial period. Teena Marie and the companies were in the sixth and last option period when their dispute arose. Each contract contained an exclusivity clause providing that during the term of the contract, including any renewals, Teena Marie may not perform like services for another employer. The contracts further provided each company with the option, exercisable at any time, to pay Teena Marie "compensation at the rate of not less than $6,000 per annum."

Between 1979 and 1980 Teena Marie recorded four albums for Motown. All were successful. Indeed her fourth and last album, "It Must Be Magic," achieved gold record status, selling more than 400,000 copies. During this time she also wrote songs for Jobete.

In May 1982, Teena Marie informed Motown and Jobete she would no longer perform under the contracts and gave a written notice of recision. In August 1982, Motown and Jobete sued Teena Marie for breach of contract and injunctive and declaratory relief, among other things. The following month, more than six years after she began performing under the contracts, Motown and Jobete exercised their options to pay Teena Marie at the rate of $6,000 per year. In November 1982, Teena Marie informed Motown and Jobete she had signed a recording contract with another company and intended to commence performing for that company later in the month.

Upon learning of her intention to perform for another company, Motown and Jobete sought a preliminary injunction under the exclusivity clauses of their contracts to prevent Teena Marie from performing services for another employer until her contracts with them expired in 1983.

The trial court granted a preliminary injunction in essence restraining Teena Marie from performing as a singer or songwriter for anyone other than Motown and Jobete until April 9, 1983, the purported expiration date of her contracts. This appeal followed.

## DISCUSSION

Before turning to the major issue in this case, we address the preliminary questions whether this appeal is moot and whether, to be enforceable by

injunction, the contract must guarantee the performer a minimum of $6,000 per year. We then explain why we believe the option clause does not satisfy the minimum compensation requirement of Civil Code section 3423.[2]

## I. The Appeal is Not Moot.

■ All the operative clauses of the injunction are modified by the words "until and including April 9, 1983." This suggests Teena Marie may do any of the enjoined acts *after* April 9, subject to Motown's and Jobete's remedies at law. However, the companies have not conceded this point although they have had the opportunity to do so in the trial court and in this court. While urging this appeal is moot, the companies' brief carefully skirts the issue of whether Teena Marie is still prohibited under the preliminary injunction from recording or otherwise using songs produced or conceived on or before April 9, 1983.

A further controversy remains with respect to the order granting the preliminary injunction. Pursuant to the injunction and Code of Civil Procedure section 529, the companies were required to file an undertaking in the sum of $50,000 "for the purpose of indemnifying [Teena Marie] for such damage as [she] may sustain by reason of" the preliminary injunction. If it should be determined on this appeal that the companies were not entitled to the injunction, Teena Marie may be entitled to recover upon this undertaking. (*Rees* v. *Gardner* (1960) 185 Cal.App.2d 630, 633 [8 Cal.Rptr. 505].)

An additional reason for proceeding to the merits of this appeal lies in the fact it involves an issue of continuing public interest which is likely to recur yet evade appellate scrutiny. (See *Liberty Mut. Ins. Co.* v. *Fales* (1973) 8 Cal.3d 712, 715 [106 Cal.Rptr. 21, 505 P.2d 213], and cf. *Lemat Corp.* v. *Barry* (1969) 275 Cal.App.2d 671, 673, fn. 2 [80 Cal.Rptr. 240].)

As we noted above, the major question in this appeal, whether the $6,000 option clause satisfies the statutory requirement of minimum compensation, has never been addressed by an appellate court in the 65-year history of Civil Code section 3423, subdivision Fifth. Nevertheless it is a question the resolution of which will affect a large segment of California business; not only the entertainment and sports industries but virtually any enterprise where the employee's service is of "a special, unique, unusual, extraordinary or intellectual character." (*Ibid.*) The resolution of this question will have ramifications on the cost of services and competition in those busi-

---

[2]Appellant also raises an issue regarding the expiration date of her contracts. This issue is only relevant if the injunction was properly granted. Because we reverse the order granting injunctive relief, we do not reach this issue.

nesses which will ultimately impact California consumers. Furthermore, as one commentator has noted, use of the $6,000 option clause has worked in favor of the employer in negotiating contract disputes with employees. (*Statutory Minimum Compensation, supra,* at pp. 491-492.) If this advantage is not justified under the statute, we should act to clarify the meaning of the statute.

Because personal services contracts are typically of short duration, especially in the entertainment field (*Statutory Minimum Compensation, supra,* at pp. 499-500, Light, *supra,* at p. 170, fn. 40), it is likely appellate review of injunctions prohibiting breach of the exclusivity clause may continue to be thwarted by the expiration of the contract term.

Under all the circumstances, we conclude this appeal is not moot.

## II. HISTORY OF THE MINIMUM COMPENSATION REQUIREMENT IN THE CALIFORNIA LEGISLATURE AND COURTS.

A brief history of the minimum compensation requirement of section 3423, subdivision Fifth, is an important aid to understanding the issues underlying the option clause.

It has long been a principle of equity that a contract to perform personal services cannot be specifically enforced. (*Poultry Producers etc. v. Barlow* (1922) 189 Cal. 278, 288 [208 P. 93]; Note, *Equity—Negative Covenants in Contracts for Personal Service* (1937) 10 So.Cal.L.Rev. 347-348.) In the mid-19th Century an exception to this rule was born in England that where the employee both covenants to perform for the employer and not to perform elsewhere, equity will enjoin a breach of the negative covenant not to perform elsewhere although it cannot specifically enforce the affirmative covenant to perform for the employer. (*Lumley* v. *Wagner* (1852) 42 Eng. Rep. 687.)[3] The infant doctrine was not warmly embraced even in the country of its birth. (*Whitwood Chem. Co.* v. *Hardman* (1891) 2 Ch. 416; 5A Corbin on contracts (1964) § 1208, p. 415.) And, while it has gradually gained acceptance in the United States, it has been questioned by some eminent legal scholars. (See, e.g., comments of Justice Holmes quoted in Note, *Lumley* v. *Wagner Denied* (1894) 8 Harv. L.Rev. 172 and 11 Williston on Contracts (3d ed. 1968) § 1447, pp. 1018-1019.)

---

[3]A full exposition of the rationale and implications of *Lumley* v. *Wagner* is beyond the scope of this opinion. A sampling of the literature includes, Clark, *Implications of Lumley v. Wagner* (1917) 17 Colum. L.Rev. 687; Gilbert, *Enforcement of Negative Covenants* (1916) 4 Cal.L.Rev. 114; Pound, *The Progress of the Law—Equity* (1920) 33 Harv. L.Rev. 420, 437-441.

When the California Civil Code was adopted in 1872 it did not include a *Lumley* exception to the rule prohibiting specific performance of personal services contracts. Section 3423, as originally enacted, provided, "An injunction cannot be granted: . . . 5. To prevent the breach of a contract, the performance of which would not be specifically enforced." (*Farnum* v. *Clarke* (1906) 148 Cal. 610, 615 [84 P. 166].) After discussing the *Lumley* line of cases and another line of cases holding to the contrary, the court in *Anderson* v. *Neal Institutes Co.* (1918) 37 Cal.App. 174, 178 [173 P. 779] observed: "Subdivision 5 of section 3423 is free from ambiguity or uncertainty. It clearly declares as the law in this state the rule laid down in one of two opposing lines of authority . . . that the court will not interfere by injunction to prevent the violation of an agreement of which, from the nature of the subject, there could be no decree of specific performance."

A year after *Anderson* v. *Neal Institutes Co.* was decided, the California Legislature amended section 3423 to allow a limited version of *Lumley*. (Stats. 1919, ch. 226, § 1, p. 328.) As originally introduced, the legislation would have prohibited an injunction "[t]o prevent the breach of a contract, other than a contract in writing for the rendition or furnishing of personal services from one to another, the performance of which would not be specifically enforced." The original bill was amended to add the stipulation "*where the minimum compensation for such service is at the rate of not less than six thousand dollars per annum.*" (Italics added.) It was amended again to require that the promised service be of a unique character the loss of which cannot be adequately compensated in damages. (J. of the Sen., Forty-Third Sess. (1919) pp. 534, 1255, 1349.)

In the 65 years since the current version of section 3423, subdivision Fifth, was adopted only two cases have interpreted the $6,000 minimum compensation requirement: *Foxx* v. *Williams* (1966) 244 Cal.App.2d 223 [52 Cal.Rptr. 896] and *MCA Records Inc.* v. *Newton-John* (1979) 90 Cal.App.3d 18 [153 Cal.Rptr. 153].

Comedian Redd Foxx brought an action for an accounting, declaratory and other relief against the recording company which was distributing his albums. The company cross-complained for injunctive relief to prevent Foxx from breaching the exclusivity clause of his contract. The trial court granted the injunction restraining Foxx " 'from making sound recordings for any other person . . . so long as royalties earned by [Foxx] under the contract . . . equal or exceed the sum of $3000 [for each six-month royalty period].' " (*Id.*, at p. 230.) On appeal the appellate court found the royalty payments were entirely contingent upon sales of Foxx' albums and, therefore, did not *guarantee* Foxx would receive any money while the injunction was in effect. (*Id.*, at p. 236.)

"[T]his royalty contract does not meet the requirements of the injunction statute even though it should ultimately appear that the royalties earned, over any given period, should exceed the rate of $6,000 per year. . . . [¶] The Legislature has concluded that an artist who is not entitled to receive a minimum of $6,000 per year by performing his contract should not be subjected to this kind of economic coercion." (*Ibid.*)

Thirteen years later the minimum compensation requirement was again an issue in a suit for injunctive relief. (*MCA Records Inc.* v. *Newton-John, supra,* 90 Cal.App.3d 18.) Unlike Foxx, who at the time of his suit was a struggling nightclub comic, Olivia Newton-John was an international star when her case came before the court. The agreement at issue provided for her to record and deliver to MCA two albums a year for two years and, at MCA's option, additional albums in three periods of one year each. In return, MCA agreed to pay royalties and a nonreturnable advance of $250,000 for each album recorded in the initial two-year period and $100,000 for each album recorded in the option years. Newton-John was required to pay her recording costs out of her advances. (90 Cal.App.3d at p. 21.) In opposing injunctive relief to enforce the exclusivity clause of this contract, Newton-John argued requiring her to bear the costs of production reduced the $100,000 payments in the option years below the $6,000 minimum required for an injunction. The appellate court interpreted section 3423, subdivision Fifth, as providing that "A party to a personal service contract may not be enjoined from rendering personal services to others unless, under the terms of the contract, she is guaranteed minimum annual compensation of $6,000." (*Id.,* at p. 22.) The court upheld the injunction on the basis of the trial court's finding of fact that after deducting recording costs Newton-John would still net at least $6,000 a year and she controlled whether that sum was received. All Newton-John had to do was make the promised record each year and keep her production costs below $94,000. The record company had to pay her the non-refundable $100,000 advance no matter whether the record succeeded in the marketplace. (*Ibid.*) *Foxx* was distinguished on the ground the comedian's contract "did not guarantee him annual compensation of $6,000." (*Ibid.*)

In response to *Foxx* and *MCA* many California record companies adopted the practice of including a clause in their contracts giving the company the right at any time during the contract to agree to pay the artist a minimum compensation of $6,000 a year. (Schlesinger, *supra,* at p. 29; *Statutory Minimum Compensation, supra,* at p. 508.) The clause in Teena Marie's contract is typical of such provisions. (See, Schlesinger, *supra,* at p. 29.) In this manner the company hedges its bets on the success of its artists. If the artist is not selling, the company does not exercise its option. If the artist catches on with the public and begins to make a substantial sum of

money for the company, the company plays its "option" card to keep the artist from jumping to another label.

As the case at bar indicates, the company may wait until the last possible moment to exercise its option. Motown and Jobete filed suit against Teena Marie in August 1982 but waited until September 1982 to exercise the option clauses. The request for a preliminary injunction was filed two months later. Thus, the companies purchased an insurance policy worth a considerable sum[4] for a minimal premium just prior to the time they could be fairly certain a loss would occur. If the option clause meets the statutory requirement of minimum compensation, the company can buy its insurance policy on the courthouse steps on its way to seek an injunction. Indeed, Schlesinger suggests the company may be able to buy its insurance policy after the "accident" has occurred; that is, after the artist has already signed and recorded with another company. (Schlesinger, *supra,* at p. 30.)

III. A PARTY TO A PERSONAL SERVICES CONTRACT MAY NOT BE ENJOINED FROM RENDERING PERSONAL SERVICES TO OTHERS UNLESS, UNDER THE TERMS OF THE CONTRACT, THE PERFORMER IS GUARANTEED MINIMUM ANNUAL COMPENSATION OF $6,000.

*Foxx* v. *Williams, supra,* 244 Cal.App.3d 223, and *MCA Records Inc.* v. *Newton-John, supra,* 90 Cal.App.3d 18, appear unambiguous on this point. Nevertheless, the erroneous interpretations of Civil Code section 3423 by the trial court and the companies indicate the point bears repeating.

The record in the proceedings below indicates the trial judge erroneously believed for purposes of injunctive relief it did not matter what compensation was provided by the contract as long as the performer actually received at least $6,000 per year. The court, in *Foxx,* addressed this precise issue and held that unless the contract itself provides for compensation of at least $6,000 a year the "contract does not meet the requirements of the injunction statute even though it should ultimately appear that the royalties earned, over any given period, should exceed the rate of $6,000 per year." (244 Cal.App.2d at p. 236; and see *MCA, supra,* 90 Cal.App.3d at p. 22.)

The companies argue by exercising their option to pay Teena Marie $6,000 a year a new contract came into existence which did guarantee her the statutory sum and it was this new contract guaranteeing $6,000 a year— not the old contract giving them an option to pay $6,000 a year—that they

---

[4]Teena Marie's expert witness estimated Motown had earned a net profit of about $1.7 million on her last album.

were seeking to enforce by injunction.[5] In support of this argument the companies cite cases describing an option contract as a kind of contract within a contract: the initial contract—an irrevocable and continuing offer to perform an act—and the final contract—the underlying promises to which the option relates. (See, e.g. *Dawson* v. *Goff* (1954) 43 Cal.2d 310, 316-317 [273 P.2d 1], *Caras* v. *Parker* (1957) 149 Cal.App.2d 621, 627 [309 P.2d 104].) We reject this interpretation of the contracts in this case.

The contracts between the companies and Teena Marie are not option contracts with respect to the exclusivity clause. In the contracts, Teena Marie does not give the companies the option to enjoy her services exclusively on condition they pay her $6,000 a year. Rather, the promise to perform exclusively for the companies is one of the terms to which Teena Marie agrees from the outset of the contracts. In addition, the authorities cited, *Dawson* and *Caras,* do not hold when an option is exercised a new contract is created. Indeed, the case relied on in both opinions, *Warner Bros. Pictures Inc.* v. *Brodel* (1948) 31 Cal.2d 766, 772 [192 P.2d 949, 3 A.L.R.2d 691], indicates just the opposite. The issue in *Warner Bros.* was whether a contract to perform services was made at the time an option contract for those services was given. The court held the contract to perform the services was made when the option contract was made. (*Id.,* at pp. 771-773.)

Alternatively, the companies argue the letters they sent Teena Marie advising her they had elected to "revise" her contract and guarantee her no less than $6,000 per year constituted new contracts modifying the former ones. (See Civ. Code, § 1698, subd. (a).)[6] The California Supreme Court has interpreted the language of section 1698 literally, holding that an executory written modification must meet the requirements of a valid contract. (See, Timbie, *Modification of Written Contracts in California* (1972) 23 Hast. L.J. 1549, 1553.) Specifically, the court has held the modification must be supported by new consideration. (*Main St. etc.* v. *L. A. Trac. Co.* (1900) 129 Cal. 301, 305 [61 P. 937].) Accordingly, an executory agreement to pay more for the same performance is unenforceable. (*Fairlane Estates* v. *Carrico Constr. Co.* (1964) 228 Cal.App.2d 65, 71 [39 Cal.Rptr. 35].) In this case, Teena Marie was required by the original contracts to perform exclusively for the companies. Consequently there was no consideration for the purported modification of the contracts. Were we to interpret defendants' letters as attempts to create new contracts, the new contracts

---

[5]We note this lawsuit was filed in August but the option clauses were not exercised until September. It is a novel litigation strategy to sue for injunctive relief to enforce a contract not yet in existence. At least the plaintiffs cannot be accused of laches.

[6]Section 1698, subdivision (a) provides, "A contract in writing may be modified by a contract in writing."

would be unenforceable by Teena Marie and, thus, would not guarantee her compensation at the rate of $6,000 a year.

Even if exercising the option clauses created "new" contracts, we question whether the provisions of the contracts regarding compensation meet the requirement of section 3423. In order to obtain an injunction to prevent the breach of a personal services contract the compensation for services under that contract must be at the rate of not less than six thousand dollars. The fact the performer was being paid at least $6,000 under some other contract with the same employer would not satisfy the statute. For example, if the performer had two personal services contracts with the same employer, one to record songs and the other to write songs, the fact the performer was guaranteed $6,000 a year under the recording contract would not support injunctive relief to prevent breach of the songwriting contract. Nor would a $6,000 guarantee under the songwriting contract support injunctive relief to enforce the record making contract.

The contracts in the case at bench appear to attempt such a set off of compensation. The recording contract with Motown provides, "Any amounts paid under [the $6,000 compensation clause] may be credited against monies thereafter payable to you pursuant to this or any other agreement between [Motown] and you, or between [Motown's] associated, affiliated, or subsidiary corporations and you." The songwriting contract with Jobete contains virtually identical language. There is no dispute Motown and Jobete are associated or affiliated corporations. If Teena Marie received $6,000 in 1982 from Jobete for songwriting, she would be guaranteed nothing from Motown for recording. Moreover, there is evidence suggesting Teena Marie performed other services for Motown and possibly Jobete as a producer, technician and the like. Presumably she received compensation for these efforts unrelated to her singing, songwriting and recording work. If she was already receiving $6,000 a year as a sound technician, for example, then she would be guaranteed nothing under the contracts before us.

Accordingly, these cagily drafted option clauses might not guarantee a cent in additional compensation for Teena Marie's songwriting and recording services or, at best, she would be guaranteed a single $6,000 a year payment for her services under both contracts.

Still, because we hold a contract giving the employer the discretion to pay the performer $6,000 a year if and when it chooses does not meet the requirements of section 3423, we need not decide whether the provisions for setting off compensation in the contracts before us would, independently, require refusal of injunctive relief.

Thus, we turn to the question left unanswered by *Foxx* and *MCA*: does an *option* to guarantee $6,000 a year at some time in the future satisfy the statutory requirement of "a contract in writing . . . where the minimum compensation . . . is at a rate of not less than six thousand dollars per annum. . . ."

One of Teena Marie's songs is entitled "Don't Turn Your Back On Me." Here, it could be said, we answer her plea.

IV. A Clause in a Personal Services Contract Giving the Employer the Option to Pay the Employee at Least $6,000 a Year Does Not Satisfy the Minimum Compensation Requirement for Injunctive Relief.

(A) *From the statutory language it appears the Legislature was referring to contracts which guarantee the performer a minimum of $6,000 per year from the outset.*

The availability of injunctive relief from breach of contract is limited by section 3423, subdivision Fifth, to "a *contract in writing* for the rendition . . . of *personal services* . . . where the minimum compensation for *such service* is at the rate of not less than six thousand dollars per annum." (Italics added.) The most reasonable, common sense reading of this language is that "minimum compensation for such service" refers back to the "contract in writing for . . . personal services." To be subject to specific enforcement, the contract must have as one of its terms a compensation provision providing for payment at the minimum rate of $6,000 per year. In other words, agreeing to payment of the minimum compensation is not a condition precedent to the granting of injunctive relief; it is a threshold requirement for admission of the contract into the class of contracts subject to injunctive relief under the statute.[7]

This reading of the statute is implicit in the *Foxx* and *MCA* decisions. In *Foxx* the court found the contract did not meet the minimum compensation requirement of section 3423 even though the *potential* for earning $6,000 a year or more existed under the contract. (244 Cal.App.2d at pp. 231, 236.) Similarly, under the option clause, the artist has merely the potential of earning $6,000 a year; there is no guarantee this compensation will ever be paid. Distinguishing *Foxx,* the court in *MCA* observed, "Unlike [Olivia

---

[7]We do not mean to imply the statute is satisfied any time there is at least $6,000 at stake under the contract. Although the issue is not presented here, in order that this opinion not be misunderstood, we are of the view the minimum compensation requirement requires at least $6,000 per year be available to the artist after deducting production costs. (See *MCA, supra,* 90 Cal.App.3d at p. 22.)

Newton-John], who is guaranteed minimum annual compensation of $200,000 in the form of nonreturnable advances in addition to any royalties she may receive, Foxx' sole compensation was in the form of royalties contingent upon prospective sales which could amount to nothing.'' (90 Cal.App.3d at pp. 22-23.) We believe the option clause is analogous to the contingent payment rejected in *Foxx*. It is nothing more than a new arrangement of an old song.

(B) *The option clause would defeat the legislative intent to limit injunctive relief to contracts where not only the services are special or unique but the performer herself is a person of distinction in her field at the time of entering the contract.*

The language of section 3423 and the Fifth subdivision in particular is clearly language of limitation. (*Poultry Producers etc.* v. *Barlow, supra,* 189 Cal. at p. 288; *Lemat Corp.* v. *Barry, supra,* 275 Cal.App.2d 671, 678.) It will be remembered subdivision 5 as originally drafted would have excepted from the prohibition against injunctive relief any personal services contract. (See Discussion, *ante,* at p. 130.) The bill was amended to add the stipulation the contract must provide for minimum compensation at the rate of $6,000 per year.

While the legislative history does not explicitly state the intent of the minimum compensation amendment it is reasonable to believe Senator Lyon, who introduced the bill, and Senator Chamberlin who proposed the minimum compensation amendment, both members of the Judiciary Committee,[8] were familiar with *Lumley* v. *Wagner, Anderson* v. *Neal Institutes Co.* as well as other leading cases on the subject and that the amendment was intended to incorporate the policies reflected in those decisions.

We begin our review with *Lumley* itself, Johanna Wagner was not an unknown member of a chorus line at the time her case arose. She was one of Europe's best known opera singers, niece of Richard Wagner and "cantatrice of the Court of His Majesty the King of Prussia." (Light, *supra,* at p. 144; 23 Encyclopedia Britannica (1942) at p. 278; *Lumley* v. *Wagner, supra,* 42 Eng. Rep. at p. 687.) Her contract with Lumley called for her to perform at Her Majesty's Theatre in London twice a week for three months at the rate of 100 pounds per week; (*id.,* at p. 688) a significant sum considering the wage of a unionized bricklayer in London at the same time was less than two pounds per week. (23 Encyclopedia Britannica, *supra,* at p. 270.)

---

[8] Senate Journal, *supra,* at pages 69, 534, 1018, 1255.

It was not uncommon for courts of that time to distinguish *Lumley* v. *Wagner* on the ground that there the services of an exceptional artist and a considerable sum were involved. Among the best known of these cases are *Whitwood Chem. Co.* v. *Hardman, supra,* 2 Ch. 416,[9] *Arthur* v. *Oakes* (7th Cir. 1894) 63 F. 310[10] and *Dockstader* v. *Reed* (1907) 121 App.Div. 846 [106 N.Y.S. 795].[11] Thus, at the time section 3423 was amended there was a discernible trend toward enforcing negative covenants against the "prima donnas" but not the "spear carriers." (See *Carter* v. *Ferguson* (1890) 58 Hun. 569 [12 N.Y.S. 580, 581]; and see generally, 11 Williston on Contracts, *supra,* § 1450, pp. 1042-1043; 5A Corbin on Contracts, *supra,* § 1209, p. 417; 4 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 1343, p. 943.)

Aside from the *Lumley* line of cases there is an even older judicial tradition which helps to explain why the California Legislature sought to limit injunctive relief to performers of star quality. ■ A fundamental reason why courts will not order specific performance of personal services contracts is because such an order would impose on the courts a difficult job of enforcement and of passing judgment upon the quality of performance. (See 11 Williston on Contracts, *supra,* § 1423, pp. 782-783; 5A Corbin on Contracts, *supra,* § 1204, p. 400; *Poultry Producers etc.* v. *Barlow, supra,* 189 Cal. 278, 288-289; Light, *supra,* at p. 143.) As Corbin observes in his treatise, "An artist does not work well under compulsion, and the court might find it difficult to pass judgment upon the performance rendered." (5A Corbin, *supra,* § 1204, p. 400.)

As the court in *Lumley* candidly admitted, it had no power to compel Madame Wagner to sing at Lumley's theatre but the injunction prohibiting her from performing elsewhere might well accomplish the same result. (42 Eng. Rep. at p. 693.) Thus there is a danger an artist prohibited from performing elsewhere may feel compelled to perform under the contract and, under the stress of the situation, turn in an unsatisfactory performance. This

---

[9] In *Whitwood,* Lindley, L.J. stated, ". . . I look upon *Lumley* v. *Wagner* rather as an anomaly to be followed in cases like it, but an anomaly which it would be very dangerous to extend." (2 Ch. at p. 428.)

[10] In *Arthur,* Justice Harlan observed, "Courts of equity have sometimes sought to sustain a contract for services requiring special knowledge or peculiar skill, by enjoining acts or conduct that would constitute a breach of such contract. To this class belong the cases of singers, actors, or musicians, who, after agreeing, for a valuable consideration, to give their professional service, at a named place and during a specified time, for the benefit of certain parties, refuse to meet their engagement, and undertake to appear during the same period for the benefit of other parties at another place." (63 F. at p. 318.)

[11] In *Dockstader* the court refused to enjoin the defendant from singing for another company noting, inter alia, "The salary agreed to be paid defendant was quite moderate, and indicates that his part was quite ordinary, and manifestly could be easily filled." (106 N.Y.S. at p. 797.)

would lead to further litigation between the parties on the adequacy of the artist's performance; the very thing the courts traditionally sought to avoid. (See, e.g., *Bethlehem Engineering Export Co.* v. *Christie* (2d Cir. 1939) 105 F.2d 933, 935 [125 A.L.R. 1441] (Hand, J.).) There is less likelihood of this conundrum arising if the performer is of great renown. Such a performer may well choose not to perform rather than risk her reputation by delivering a sub-par performance.[12] (See Clark, *supra,* at p. 690, fn. 11.)

In 1919 the sum of $6,000 a year was more than five times the average national wage of $1,142. (Historical Statistics of the United States (1976) at p. 164, Table: Average Annual Earnings of Employees: 1900 to 1970.) This is equivalent to setting the minimum compensation figure at $100,000 today. (Based on the 1982 median income level of $20,171. See Statistical Abstract of the United States (1984) at p. 459, Table 754.) By selecting such a large sum, the Legislature indicated an intent injunctive relief not be available against a performer, however capable, who had not yet achieved distinction. The fact the bill was further amended to provide the services must be special is a further indication the Legislature intended the statute to apply only to persons who had attained "star quality" no matter how special their services might be.

Without doubt the passage of time has diluted the effect of this legislative intent but the option clauses before us would totally wash it away. It would allow a record company to bind the entire student body of "Rydell High" to personal services contracts (and pay them nothing) on the off-chance one of them turns out to be Olivia Newton-John.

It is no answer to say that by the time Motown and Jobete sought injunctive relief to enforce the exclusivity clauses Teena Marie had become a star. Motown and Jobete did not contract with a star. By their own admission they contracted with a "virtual unknown." Nothing in section 3423 prevents the companies from seeking damages from Teena Marie for breach of the exclusivity clause.[13] That section merely says for reasons of public policy the exclusivity clause of a contract can only be enforced by injunction when the contract is with a performer of requisite distinction as measured by the compensation the employer is willing to pay.[14] Moreover, as we explain

---

[12] This may explain why Madame Wagner did not, after all, sing for Lumley. (Tannenbaum, *supra,* 42 Cal.L.Rev. at p. 19.)

[13] See *Foxx, supra,* 244 Cal.App.2d at pp. 236-237; *American Broadcasting Companies* v. *Wolf* (1980) 76 App.Div.2d 162 [430 N.Y.S.2d 275, 285]; Schlesinger, *supra,* at p. 28.

[14] Motown agreed to pay Teena Marie minimum union scale for ten masters per year, resulting in a guarantee of $600 to $900 per year. The Jobete agreement provided only for royalties. Thus, as measured by the companies, Teena Marie was anything but star quality when she signed the contracts.

below, allowing the companies, once they judge the artist to have achieved star quality, to enforce the exclusivity clause by injunction would violate the concept of fundamental fairness which is also embodied in section 3423.

(C) *The option clause violates the concept of fundamental fairness embodied in Civil Code section 3423.*

We agree with the court in *Foxx, supra,* that the $6,000 minimum compensation requirement was intended to balance the equities between employer and performer. (244 Cal.App.2d at p. 236.) This is quite clear when section 3423 is read in connection with Civil Code section 3391, subdivision 2, which provides specific performance cannot be enforced against a party as to whom the contract is not "just and reasonable." Taken together those sections demand a minimum standard of fairness as a condition on equitable enforcement of an exclusivity clause in a personal services contract. (See Light, *supra,* at p. 153.)

"As one grows more experienced and skillful there should be a reasonable opportunity to move upward and to employ his abilities to the best advantage and for the highest obtainable compensation." (*De Haviland* v. *Warner Bros. Pictures* (1944) 67 Cal.App.2d 225 [153 P.2d 983], 235.) "[A]ny agreement that limits a person's ability to follow his vocation must be strictly construed. . . ." (*Lemat Corp.* v. *Barry, supra,* 275 Cal.App.2d at pp. 678-679.) Therefore, "[a]n injunction which forbids an artist to accept new employment may be a harsh and powerful remedy. The monetary limitation in the statute is intended to serve as a counterweight in balancing the equities. The Legislature has concluded that an artist who is not entitled to receive a minimum of $6,000 per year by performing his contract should not be subjected to this kind of economic coercion." (*Foxx, supra,* 244 Cal.App.2d at p. 236.)

If we were to hold the option clause satisfies section 3423, we would nullify the $6,000 compensation requirement as a counterweight on the employer. Whereas the $6,000 compensation requirement was intended to balance the equities, the $6,000 option clause is intended to allow record companies to avoid payment of minimum compensation while retaining the power of economic coercion over the artist. (*Statutory Minimum Compensation, supra,* at p. 508; Light, *supra,* at p. 165; Schlesinger, *supra,* at p. 29.) This is accomplished in two ways. First, the option clause gives the company the coercive power of a credible threat of injunctive relief without it having to guarantee or pay the artist anything. The threat of a prohibitory injunction may be just as effective as the injunction itself in discouraging the artist from seeking more lucrative employment. (*Statutory Minimum Compensation, supra,* at p. 519.) Second, in practice, the company will

exercise its option to pay minimum compensation only when it is certain the artist intends to breach the exclusivity clause by performing for another and, even then, only when exercising the option is necessary to enable the company to assert in court the contract does indeed provide for the statutory minimum compensation. (Light, *supra,* at p. 165.) Of course, by then, the company's agreement to pay the artist a minimum of $6,000 a year is meaningless. If the artist was not already earning far in excess of that amount from royalties, the artist's worth to the company would not justify the expense of litigating the case. The record company is in fact merely "electing" to pay that which it would have to pay anyway as a result of royalties from sales.[15] (Schlesinger, *supra,* at p. 29.)

Based on the foregoing we conclude the option clauses in the Motown and Jobete contracts do not support equitable relief in the form of an injunction restraining Teena Marie from performing for other employers.

### DISPOSITION

The order granting a preliminary injunction is reversed.

Thompson, J., concurred.

---

[15]This is the fact pattern of the case at bar. (See *ante,* p. 127.)